STATE OF NORTH CAROLINA v. NORFOLK JUNIOR BEST

No. 300A93

(Filed 9 February 1996)

### 1. Criminal Law § 78 (NCI4th)— pretrial publicity—denial of motion for second change of venue

In a capital trial wherein defendant made a motion for a change of venue from Columbus County to Bladen, New Hanover, or Brunswick County, and the trial court allowed the motion and moved the case to Bladen County because of pretrial publicity, the trial court did not err by denying defendant's motion for a second change of venue to either New Hanover or Brunswick County on the ground that Bladen is a small county contiguous to Columbus County with the same newspapers and television stations serving both counties where defendant introduced newspaper articles which were reports of the facts of the case and an affidavit indicating that news broadcasts on television stations had reported the case; there was no evidence of widespread knowledge about the case in Bladen County; and six of the jurors chosen to serve at defendant's trial had not heard of the case, four of the jurors had seen something about the case on television but stated that they had not formed an opinion about it, and two of the jurors had read about the case in a newspaper but had formed no opinion about it. N.C.G.S. § 15A-957.

**Am Jur 2d, Criminal Law §§ 372-378.**

### 2. Jury § 260 (NCI4th)— peremptory challenges of black potential jurors—racially neutral reasons—absence of racial motivation

The trial court did not err by finding that the reasons for the State's peremptory challenges of six black prospective jurors and one black alternate juror in a capital trial were racially neutral and that the challenges were not racially motivated where the prosecutor stated the following reasons for the challenges: the first potential juror had seen defendant although she did not know him, was hesitant in responding to questions about the death penalty, and had family members who had been prosecuted by the district attorney; the second potential juror opposed the death penalty although not to the extent that she could be challenged for cause; the third potential juror was serving a proba-

tionary sentence for Employment Security Commission fraud; the fourth potential juror was against the death penalty and was hesitant about her ability to vote for the death penalty; the fifth potential juror was a friend of a man charged with murder; the sixth potential juror indicated she was against the death penalty but would go along with the 'rest of the jurors; and the prospective alternate juror had strong religious beliefs against the death penalty and went "back and forth" on her position on the death penalty.

**Am Jur 2d, Criminal Law §§ 681, 682; Jury §§ 234, 235, 244.**

**3. Jury § 251 (NCI4th)— peremptory challenges—discrimination—failure to object**

Where defendant did not object to any of the State's peremptory challenges on the ground of discrimination against women or against African-American women, he cannot raise the question for the first time on appeal.

**Am Jur 2d, Jury §§ 234, 235, 244.**

**4. Evidence and Witnesses § 2211 (NCI4th)— inconclusive DNA tests—exclusion of ninety-four percent of black population—relevancy**

Testimony by a DNA expert that DNA tests performed on semen taken from the victim's vagina and blood taken from the defendant were inconclusive in that they did not exclude defendant but they eliminated ninety-four of one hundred persons in the black population was relevant in a prosecution of defendant for murder and rape since the testimony made it more likely that defendant committed the crimes if the tests eliminated ninety-four percent of the black population but not defendant.

**Am Jur 2d, Expert and Opinion Evidence §§ 278, 300.**

**5. Rape and Allied Offenses § 90 (NCI4th)— first-degree rape—sufficiency of evidence**

The State's evidence was sufficient for the jury in a prosecution of defendant for the first-degree rape of a murder victim where the jury could find that someone other than her husband penetrated the victim from testimony by a DNA expert that semen

taken from the victim's vagina was not from her husband; the jury could find the penetration was not consensual from evidence of the defensive wounds on the victim's hands, the cuts on her neck and chest, and the multiple injuries to her face and head; and defendant's identity as the perpetrator of the crime was established by his fingerprint on a knife found next to the body of the rape victim's husband.

**Am Jur 2d, Rape §§ 88 et seq.**

### 6. Evidence and Witnesses § 110 (NCI4th)— evidence inadmissible to show habit—admission not plain error

Assuming that testimony by the daughter of two robbery-murder victims that her father kept an envelope in his wallet containing $1,000 he had received from the settlement of an insurance claim and her mother kept in an envelope $800 she had received from the sale of a car was not admissible to prove habit and was not admissible under some other rule of evidence, the admission of this testimony did not amount to plain error.

**Am Jur 2d, Evidence §§ 303, 316-319.**

### 7. Constitutional Law § 370 (NCI4th)— death penalty— defendant's failure to show mental retardation

Defendant failed to show he is mentally retarded, and there is thus no merit to his contention that the death penalty was improperly imposed upon him because he is mentally retarded, where the evidence showed that defendant has an IQ of seventy; defendant presented evidence that he was employed and able to function in society; and this evidence negates a finding that he has a deficit in adaptive behavior. N.C.G.S. § 122C-3(22).

**Am Jur 2d, Criminal Law §§ 625-628.**

### 8. Evidence and Witnesses § 3003 (NCI4th)— cross-examination—conviction more than ten years old—error cured by instruction

Any error when the prosecutor asked defendant on cross-examination about an assault conviction more than ten years old was cured by the trial court's instruction to the jury not to consider the question. N.C.G.S. § 8C-1, Rule 609(b).

**Am Jur 2d, Witnesses §§ 916, 924.**

### 9. Criminal Law § 471 (NCI4th)— prosecutor's improper question—error cured by instruction

Assuming without deciding that the prosecutor was guilty of misconduct by asking defendant's DNA expert whether she knew that she was the second DNA expert consulted by defendant, any error was cured when the trial court sustained defendant's objection to the question and instructed the jury to disregard the question and not to consider the question in its deliberations.

**Am Jur 2d, Trial §§ 705 et seq.**

### 10. Criminal Law § 441 (NCI4th)— prosecutor's argument—improper attack on expert's credibility—error cured by instruction

Assuming without deciding that the prosecutor improperly attacked the credibility of defendant's DNA expert by arguing to the jury that defendant chose an expert from Ohio rather than choosing one from either of two laboratories in North Carolina, any error was cured when the trial court sustained defendant's objection to the argument and instructed the jury not to consider it.

**Am Jur 2d, Trial §§ 705 et seq.**

### 11. Criminal Law § 463 (NCI4th)— prosecutor's argument—murder victim aware wife being raped—supporting evidence

The prosecutor did not improperly argue to the jury that after the male victim received his fatal injuries, he was aware or was contemplating that his wife was being raped where the evidence would support a conclusion that the male victim, whose carotid artery was severed, had the ability to comprehend during the struggle and while he was wounded that his wife might be raped.

**Am Jur 2d, Trial §§ 321 et seq., 554-556.**

### 12. Criminal Law § 466 (NCI4th)— prosecutor's argument—not attack on defense counsel's veracity

The prosecutor did not improperly argue in a capital trial that defense counsel lied to the jury when he referred to "that cock-and-bull mess that [defense counsel] have thrown up to you" where the record reveals that the prosecutor was merely responding to defense counsel's argument that the investigators should have examined the bag of a vacuum cleaner near the male

victim's body for blood when he argued that it was not logical for investigators to conclude that the perpetrator used the vacuum cleaner to clean up blood from the killings. The prosecutor's argument was directed at the improbability of the story, not at the veracity of defense counsel.

### Am Jur 2d, Trial §§ 497, 499.

**13. Evidence and Witnesses § 2950 (NCI4th)— cross-examination about N.C. Resource Center—competency to show bias**

Where an intern at the N.C. Resource Center testified for defendant, and the intern and the Resource Center had helped defendant prepare his defense, the State was entitled to cross-examine the witness about the nature and function of the Resource Center to show bias, motive, or interest.

### Am Jur 2d, Witnesses §§ 815, 853.

**14. Criminal Law § 438 (NCI4th)— capital sentencing—prosecutor's argument—not personal opinion defendant lied—comment on mitigating circumstance**

The prosecutor did not express a personal opinion that defendant was lying to the police by his comment in his closing argument in a capital sentencing proceeding that "I suppose he would answer questions from the officers as long as he wasn't telling the truth about it and as long as he was saying . . . [he] didn't do anything." Rather, the prosecutor was commenting on the strength of the evidence supporting the nonstatutory mitigating circumstance that defendant "was cooperative in answering questions of the investigating officers."

### Am Jur 2d, Trial §§ 572, 1441.

**15. Criminal Law § 426 (NCI4th)— capital sentencing—prosecutor's argument—not comment on invocation of right to silence—comment on mitigating circumstance**

The prosecutor did not improperly comment on defendant's invocation of his right to remain silent when he argued in a capital sentencing proceeding that when defendant and an officer started talking about something important, defendant told the officer to take him back to his cell; rather, the prosecutor was merely arguing that the jury should not find any mitigating value in the nonstatutory mitigating circumstance that defendant was cooperative in answering questions of the investigating officers.

**Am Jur 2d, Trial §§ 572, 1441.**

## 16. Criminal Law § 1322 (NCI4th)— capital sentencing—parole unlikely—failure to instruct

The trial court did not violate defendant's due process rights in a capital sentencing proceeding by failing to inform the jury that he was unlikely ever to be paroled.

**Am Jur 2d, Trial §§ 572, 573, 575, 1441, 1443.**

## 17. Criminal Law § 1325 (NCI4th)— capital sentencing—instructions—weighing aggravating and mitigating circumstances—mitigating circumstances considered

The trial court did not err by failing to require the jury in a capital sentencing proceeding to consider any mitigating circumstances found in Issue Two when weighing the aggravating circumstances against the mitigating circumstances in Issues Three and Four.

**Am Jur 2d, Trial §§ 572, 573, 1441.**

## 18. Criminal Law § 1323 (NCI4th)— capital sentencing—nonstatutory mitigating circumstances—finding of mitigating value

It was not error for the trial court to charge the jury in a capital sentencing proceeding that in order to find a nonstatutory mitigating circumstance, it must find the facts supporting the circumstance to exist and that those facts have mitigating value.

**Am Jur 2d, Trial §§ 572, 1441.**

## 19. Criminal Law §§ 478, 872 (NCI4th)— juror communication with court—instructions—no impropriety

The trial judge's instructions, after receiving a report from the jury foreman that one juror wanted to talk with the judge, did not impose an improper rule that required the assent of all jurors for a single juror to communicate with the court; rather, the judge's statement meant that if one or more of the jurors wanted to ask a question of the court, the jury should agree on the form of the question, and the foreman could submit the question in writing to the court, but there was no restriction on any question a juror desired to ask.

**Am Jur 2d, Trial §§ 1573 et seq.**

**20. Criminal Law § 1329 (NCI4th)— capital sentencing—individual jury poll**

The trial court did not fail to conduct an individual jury poll in a capital sentencing proceeding as required by N.C.G.S. § 15A-2000(b), although the original transcript indicated that the foreperson answered for certain jurors the inquiry as to the jurors' assent, where the amended transcript shows that each juror answered each question in compliance with § 15A-2000(b).

**Am Jur 2d, Criminal Law §§ 1012 et seq.**

**21. Criminal Law § 1373 (NCI4th)— two first-degree murders—death penalties not disproportionate**

Sentences of death imposed upon defendant for two first-degree murders were not disproportionate to the penalties imposed in similar cases where the evidence showed that defendant beat and stabbed the elderly victims in their home to facilitate a robbery, and the jury found as aggravating circumstances for each murder that (1) defendant had previously been convicted of a felony involving the use or threat of violence to the person, (2) the murder was committed for pecuniary gain, and (3) the murder was part of a course of conduct which included the commission of crimes of violence against another person.

**Am Jur 2d, Criminal Law §§ 609 et seq., 628.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of death entered by Hobgood, J., at the 17 May 1993 Special Criminal Session of Superior Court, Bladen County, upon verdicts of guilty on two counts of first-degree murder. The defendant's motion to bypass the Court of Appeals as to his convictions of first-degree burglary, first-degree rape, and robbery with a dangerous weapon was allowed by this Court on 19 July 1994. Heard in the Supreme Court 15 March 1995.

The defendant was tried on two charges of first-degree murder and one charge each of first-degree burglary, robbery with a dangerous weapon, and first-degree rape. The State's evidence showed that Leslie Baldwin and his wife, Gertrude Baldwin, were eighty-two and seventy-nine years of age, respectively. They were killed in their home during the night of 30 November 1993. Earlier that day, the defendant had done yard work for them.

STATE v. BEST

[342 N.C. 502 (1996)]

Mr. Baldwin died as a result of the cutting of his carotid artery, and Mrs. Baldwin died of blunt-force trauma to the head. Money was missing from Mr. Baldwin's wallet and from Mrs. Baldwin's purse. The defendant's DNA matched one of the semen samples taken from Mrs. Baldwin, and his fingerprint matched one on a paring knife found beside Mr. Baldwin's body. The defendant bought between $700 and $1,000 worth of crack cocaine within two days after the killings.

The defendant was found guilty of all charges. After a sentencing hearing, the jury recommended that the death penalty be imposed on both convictions of murder, which sentences were imposed. The defendant was also sentenced to fifty years in prison for first-degree burglary, life in prison for first-degree rape, and forty years in prison for robbery with a dangerous weapon. The prison sentences are to be served consecutively.

The defendant appealed.

*Michael F. Easley, Attorney General, by Thomas S. Hicks, Assistant Attorney General, for the State.*

*Henderson Hill, Director, North Carolina Resource Center, Office of the Appellate Defender, by Marshall Dayan, Senior Staff Attorney, for defendant-appellant.*

WEBB, Justice.

**[1]** The defendant first assigns error to the denial of his motion for a change of venue to either New Hanover County or Brunswick County. The crimes involved in this case occurred in Columbus County. The defendant made a motion to change the venue to Bladen, New Hanover, or Brunswick County. The motion was allowed, and the trial was moved to Bladen County after the court found "there has been a great deal of word of mouth publicity concerning this case" and "numerous newspaper articles and editorials . . . including a recital of all previous convictions of the defendant as well as charges filed against him whether or not convicted."

The defendant then made a motion for a second change of venue to either New Hanover or Brunswick County which was denied. The defendant says this was error. He contends that Bladen County is a small county contiguous to Columbus County with the same newspapers and television stations serving both counties. He contends that if he could not receive a fair trial in Columbus County, he could not receive a fair trial in Bladen County. He argues that he was entitled to

take advantage of the findings of fact in the order moving the case from Columbus County in the determination of his motion to change the venue from Bladen County. We presume the court in Bladen County considered the order in Columbus County, but it was not bound by it. The court in Bladen County could make a determination as to whether a fair trial could be had in Bladen County.

N.C.G.S. § 15A-957 provides that if there is so great a prejudice against a defendant in the county in which he is charged that he cannot receive a fair trial, the court must transfer the case to another county or order a special venire from another county. The purpose of this statute is to insure that jurors decide cases on evidence introduced at trial and not on something they have learned outside the courtroom. *State v. Moore*, 335 N.C. 567, 440 S.E.2d 797 (1994); *State v. Gardner*, 311 N.C. 489, 319 S.E.2d 591 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985). In most cases a showing of identifiable prejudice to the defendant must be made, and relevant to this inquiry is testimony by potential jurors that they can decide the case based on evidence presented and not on information received outside the courtroom. *State v. Abbott*, 320 N.C. 475, 358 S.E.2d 365 (1987).

In the hearing on the motion to move the case from Bladen County, the defendant introduced articles and editorials from newspapers from Columbus, Bladen, and New Hanover counties, as well as an affidavit indicating that news broadcasts on television stations had reported the case but not what was contained in the broadcasts. The newspaper articles, except for the editorials, were reports of facts involved in the case. There was no evidence, as there had been in the hearing on the motion to move the case from Columbus County, of widespread knowledge concerning the case.

We cannot hold, based on the evidence presented at the hearing, that there was error in denying the motion for a change of venue. This conclusion is reinforced by the answers given by the jurors during the selection of the jury. Six of those selected to serve had not heard of the case. Four of the jurors selected had seen something about the case on television, but each said he or she had not formed an opinion about it. Two of the jurors had read something about the case in a newspaper but had formed no opinion about it. We are confident the defendant was tried by a jury which was not influenced by information received outside the courtroom.

This assignment of error is overruled.

**[2]** The defendant, who is black, next assigns error to the overruling of his objection to the allowance of peremptory challenges by the State of six potential black jurors. He says his constitutional rights as delineated in *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986), were violated by this action. When an objection is made to the exercise of a peremptory challenge on the ground that the challenge is racially motivated, the trial judge must first determine whether the objecting party has made a *prima facie* case of discrimination. If the court determines he has done so, the proponent of the strike must come forward with a racially neutral explanation. The explanation may be implausible or even fantastic, but if it is racially neutral the opponent of the challenge has satisfied his requirement in this step in the process. If the court finds that the explanation is racially neutral, it must then determine whether the challenge was racially motivated. The burden of proof is on the party objecting to the challenge, and the determination of the question of racial motivation is a finding of fact entitled to great deference by an appellate court. *Purkett v. Elem*, —— U.S. ——, 131 L. Ed. 2d 834 (1995); *Hernandez v. New York*, 500 U.S. 352, 114 L. Ed. 2d 395 (1991).

When the defendant objected to the peremptory challenges, the prosecutor gave his reasons for exercising them without a ruling by the court that the defendant had made a *prima facie* showing of racial discrimination. We shall examine this assignment of error as if such a finding had been made as to each venireman. *See Hernandez v. New York*, 500 U.S. at 363, 114 L. Ed. 2d at 405.

The State exercised six peremptory challenges against blacks while the jury was being selected and one such challenge while two alternate jurors were being selected. The first potential black juror peremptorily challenged was Lori Featherson. The prosecuting attorney stated as his reasons for exercising the challenge that Ms. Featherson had seen the defendant although she did not know him, that he perceived that she had difficulty in expressing her opinion as to the death penalty, and that an assistant district attorney had prosecuted her grandfather. The court found from the record that Ms. Featherson stated that she had seen the defendant; that from the court's personal observation, she was hesitant in responding to questions regarding the death penalty; and that Ms. Featherson stated she had family members who had been prosecuted by the district attorney. The court held that the defendant had not carried his burden of showing that the challenge to Ms. Featherson was racially discriminatory.

**STATE v. BEST**

[342 N.C. 502 (1996)]

The second potential black juror peremptorily challenged by the State was Vontea Horton. The State gave as its reason for the challenge that she was opposed to the death penalty although not to the extent that she could be challenged for cause. The court found Ms. Horton had stated she was opposed to the death penalty but could consider voting for the death penalty. The court found further that this challenge was not racially discriminatory and overruled the defendant's objection to it.

The third black venireman peremptorily challenged by the State was Nathan Swindell. The State gave as its reason for this challenge that Mr. Swindell had been convicted of an Employment Security Commission fraud and was serving a probationary sentence for it. The court found this challenge was not racially motivated and overruled the objection to it.

The fourth potential black juror peremptorily challenged by the State was Shirley Shaw. The State gave as its reason for the challenge that she had "expressed that she was against the death penalty, and she was very hesitant about her ability to be able to vote for the death penalty." The court found that she had said she was against the death penalty. It found further that the challenge was not racially motivated and overruled the defendant's objection to it.

The fifth potential black juror as to whom the State exercised a peremptory challenge was Lula Corbett. The State gave as its reason for exercising this challenge that she was a friend of a man charged with murder who would be prosecuted by the district attorney's office that was prosecuting this case. The court found that this prospective juror had stated that she was a friend of a person who was charged with murder. It further found that the challenge by the State was not racially motivated and overruled the objection to the challenge.

The sixth potential black juror peremptorily challenged by the State was Rosa Lewis. The prosecuting attorney articulated as his reason for exercising the challenge that she had indicated that she was against the death penalty but would "go along with what the rest of the jurors would do." The court found that Ms. Lewis had so stated and found further that the challenge was not racially motivated. The defendant's objection to the challenge was overruled.

The prospective black alternate juror peremptorily challenged by the State was Shelbin Simpson. The State gave as its reason for the

challenge that Ms. Simpson stated she had strong religious beliefs against the death penalty and went "back and forth" on her position on the death penalty. The court found that the proposed juror had so said and found that this challenge was not racially motivated. The defendant's objection to this challenge was overruled.

We cannot find error in the rulings by the court on the peremptory challenges. The State articulated its reasons for the challenges without a finding that the defendant had made a *prima facie* showing of racial discrimination. The court found that all the reasons for the challenges articulated by the State were racially neutral. The court then held as to each challenge that the challenges were not racially motivated. Giving this finding of fact great deference, as we are required to do, we cannot hold it was error for the court to rule as it did.

[3] The defendant argues under this assignment of error that the prosecution's exercise of twelve of fourteen peremptory challenges against women makes a *prima facie* case of gender discrimination. *J.E.B. v. Alabama ex rel. T.B.*, —— U.S. ——, 128 L. Ed. 2d 89 (1994). He asks that we remand the case to superior court for a hearing as to whether there was gender discrimination in the selection of the jury.

The defendant also argues that the peremptory challenges by the State of seven of nine African-American women establish a *prima facie* case of discrimination against African-American women. He asks for a hearing in superior court on this matter.

The defendant did not object to any of the peremptory challenges on the ground of discrimination against women or African-American women. He cannot raise the question for the first time on appeal. *State v. Williams*, 308 N.C. 47, 301 S.E.2d 335, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983).

This assignment of error is overruled.

[4] The defendant next assigns error to the admission of expert testimony from an agent of the State Bureau of Investigation. The agent, without objection by the defendant, was found to be an expert in DNA analysis. He testified he had performed tests by comparing the DNA from semen found in Mrs. Baldwin's vagina with DNA from blood taken from the defendant. The SBI agent testified that the DNA sample taken from the semen was degraded and was difficult to separate from the DNA from the victim's blood. He testified that the tests were inconclusive in that they did "not count[] [the defendant] out" and

that the tests would eliminate approximately ninety-four of one hundred people from the black population.

The defendant contends it was error to admit this "skewed and patently unreliable DNA evidence." This testimony was relevant, as it made it more likely that the defendant was guilty if ninety-four of one hundred persons in the black population were excluded by the DNA test, and the defendant was not. The weight of the evidence was for the jury.

This assignment of error is overruled.

[5] The defendant next assigns error to the denial of his motion to dismiss the charge of first-degree rape. We disagree. The DNA expert testified that the semen taken from the vagina of Mrs. Baldwin was not from Mr. Baldwin. This is evidence from which the jury could find that someone other than her husband penetrated Mrs. Baldwin. The injuries she sustained, including the defensive wounds on her hands, the cuts on her neck and chest, and the multiple injuries to her face and head, are evidence from which the jury could find the penetration was not consensual. The defendant's identity as the perpetrator of the crime is established by his fingerprint on the knife found next to the body of Mr. Baldwin. Any discrepancies in the evidence were for the jury to resolve. *State v. Powell*, 299 N.C. 95, 261 S.E.2d 114 (1980).

This assignment of error is overruled.

[6] The defendant next contends that it was error to allow certain testimony by the decedents' daughter. The defendant did not object to this testimony, and we must examine this assignment of error under the plain error rule. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983). Betsy Baldwin Marlowe, the decedents' daughter, testified that she knew her father's habit of keeping in an envelope in his wallet approximately $1,000 he had received from the settlement of an insurance claim. Ms. Marlowe also testified that her mother kept in an envelope approximately $800 she had received from the sale of an automobile.

The defendant says that this testimony was propounded as evidence of habit but that it did not show habit and was not admissible under N.C.G.S. § 8C-1, Rule 406. The defendant says this testimony was evidence of specific instances in which the parents of Ms. Marlowe received sums of money.

STATE v. BEST

[342 N.C. 502 (1996)]

Assuming this testimony was not admissible to prove habit and that it was not admissible under some other rule of evidence, its admission did not amount to plain error. It was not a " '*fundamental error*, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done.' " *Odom*, 307 N.C. at 660, 300 S.E.2d at 378 (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982) (footnotes omitted)).

This assignment of error is overruled.

[7] The defendant next assigns error to the imposition of the death penalty because he says he is mentally retarded. The Eighth Amendment to the Constitution of the United States, which forbids the infliction of cruel and unusual punishment, does not forbid the death penalty for mentally retarded persons. *Penry v. Lynaugh*, 492 U.S. 302, 106 L. Ed. 2d 256 (1989). The statute which provides for the death penalty does not have an exception for mental retardation. N.C.G.S. § 15A-2000 (Supp. 1995). If we are to hold that a mentally retarded person may not be executed in this state, we would have to hold that this part of our capital punishment scheme is unconstitutional under Article I, Section 27 of the Constitution of North Carolina.

The first difficulty with the defendant's argument is that it is not at all certain that he is mentally retarded. N.C.G.S. § 122C-3(22) defines mental retardation as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before age 22." N.C.G.S. § 122C-3(22) (1993). An IQ of less than seventy is considered a "significantly subaverage general intellectual functioning." *State v. Skipper*, 337 N.C. 1, 65, 446 S.E.2d 252, 288 (1994) (Exum, C.J., concurring), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995). The defendant has an IQ of seventy. The defendant presented evidence that he was employed and was able to function in society. This tends to negate a finding that he had a deficit adaptive behavior. The defendant has not shown he is mentally retarded.

The constitutional issue which the defendant presses under this assignment of error is not before us. This assignment of error is overruled.

[8] In his next assignment of error, the defendant argues there were nine different examples of prosecutorial misconduct which entitle

the defendant to a new trial. The first instance argued by the defendant involved a question on cross-examination of the defendant in which the prosecutor asked him whether he had been convicted of assault with a deadly weapon inflicting serious injury in 1973. The court sustained the objection to this question and instructed the jury not to consider it.

The State had not advised the defendant of its intent to use the evidence which the question was designed to elicit. The defendant contends it was error for the State to ask this question pursuant to N.C.G.S. § 8C-1, Rule 609(b) because the assault conviction was more than ten years old. Any error that occurred was cured by the instruction to the jury not to consider the question. The information imparted by this question was not so shocking or disturbing that the jury would have been unable to follow the court's instruction. We assume the jury followed the court's instructions. *State v. Larrimore*, 340 N.C. 119, 168, 456 S.E.2d 789, 815 (1995).

[9] The defendant's second contention is that the prosecutor was guilty of misconduct by asking the defendant's DNA expert whether she knew that she was the second DNA expert consulted by the defendant. The defendant argues that this question was asked in bad faith and was designed to give the jury the impression that the defendant had shopped for an expert until he found one that would testify as the defendant wanted. The defendant contends the prosecutor knew this was not the case. *State v. Dawson*, 302 N.C. 581, 276 S.E.2d 348 (1981).

The defendant objected to the question. The trial court sustained the objection and instructed the jury to disregard the question and not to consider the question in its deliberations. Assuming without deciding that misconduct occurred, the court's instruction cured any error. The instruction was clear, and we must assume the jury followed the instructions of the court in making its determination. *Larrimore*, 340 N.C. at 168, 456 S.E.2d at 815.

[10] The defendant's fourth contention is that the prosecutor improperly attacked the credibility of the defendant's DNA expert by arguing to the jury that the defendant chose an expert from Ohio rather than choosing one from either of two laboratories in North Carolina.

The defendant objected to the argument. The trial court sustained the objection and instructed the jury not to consider the prosecutor's argument. Again, assuming without deciding that misconduct

occurred, the court's instruction cured any error. The instruction was clear, and we must assume the jury followed the instructions of the court in making its determination. *Id.*

**[11]** The defendant next contends that the prosecutor improperly argued during the argument at the guilt phase that after Mr. Baldwin received his fatal injuries, he was aware or was contemplating that his wife was being raped.

The defendant argues that the prosecutor's argument was improper because the State failed to present any evidence that Mr. Baldwin had the ability to comprehend anything after his carotid artery had been severed. "Counsel is given wide latitude to argue the facts and all reasonable inferences which may be drawn therefrom, together with the relevant law, in presenting the case to the jury." *State v. Britt*, 291 N.C. 528, 537, 231 S.E.2d 644, 651 (1977). In addition, during a closing argument, an attorney may, "on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue." N.C.G.S. § 15A-1230(a) (1988). The forensic pathologist who performed the autopsy on Mr. Baldwin testified at trial that he was unable to determine the exact time of Mr. Baldwin's death. Blood spatters on the wall, bookcases, and the door to Mrs. Baldwin's bedroom supported the inference that Mr. Baldwin received his lethal wound in that location. It could be concluded from the evidence that Mr. Baldwin had the ability to comprehend during the struggle and while he was wounded that his wife might be raped.

**[12]** The defendant next contends that the prosecutor, during his jury argument, said that defense counsel lied to the jury, which violates the rule of *State v. Sanderson*, 336 N.C. 1, 442 S.E.2d 33 (1994), that a prosecutor may not engage in improper conduct toward defense counsel. During his jury argument, the prosecutor said, "And [the defendant is] not entitled to have you buy that cock-and-bull mess that [defense counsel] have thrown up to you."

Our review of the record shows that the prosecutor used the term "cock-and-bull mess" to refer to the contention made by defense counsel in closing argument that the investigators should have examined the bag of the vacuum cleaner that was in the hallway near Mr. Baldwin's body for evidence. The record reveals that the prosecutor was merely responding to the contention by saying that it was not logical for the investigators to conclude that the perpetrator used the vacuum cleaner to clean up the blood left from the killings. The prosecutor's argument was directed at the improbability of the story, not

at the veracity of defense counsel. The defendant's contention is without merit.

[13] The defendant next contends there was error in the cross-examination of Susan Brooks, a law-student intern with the North Carolina Resource Center, who testified for the defendant. The defendant contends that rather than directing the cross-examination to the substance of Ms. Brooks' testimony, the State concentrated on the nature and function of the Resource Center, which was irrelevant. Ms. Brooks and the Resource Center had helped the defendant prepare his defense. The State was entitled to cross-examine Ms. Brooks about the Resource Center to show bias, motive, or interest. *State v. Spicer*, 285 N.C. 274, 204 S.E.2d 641 (1974).

[14] The defendant's final contention in this assignment of error is that the State committed gross misconduct during closing argument of the sentencing phase by calling the defendant a liar and by chastising him for exercising his constitutional right to stop talking to police officers.

The defendant argues that the prosecutor called the defendant a liar when he argued to the jury:

I suppose he would answer questions from the officers, as long as he wasn't telling the truth about it and as long as he was saying, "I didn't do anything."

The prosecutor made this argument while arguing that the jury should not find the nonstatutory mitigating circumstance "[t]hat although the defendant did not confess, he was cooperative in answering questions of the investigating officers." The defendant testified at trial that when questioned about going back to the Baldwins' house after he finished his work there, he told the officers that he did not return.

A prosecutor may not express a personal opinion concerning the veracity of a witness' testimony. *State v. Miller*, 271 N.C. 646, 157 S.E.2d 335 (1967). In this case, the prosecutor was not expressing his belief that the defendant was lying to the police officer. The phrase "I suppose" does not refer to the prosecutor's personal opinion. Rather, it is a comment by the prosecutor on the strength of the evidence supporting the mitigating circumstance.

[15] The defendant also argues that the following argument of the prosecutor was an improper comment on his invocation of the right to remain silent:

So when [the defendant and the officer] start talking about something real important . . . [w]hat does he tell [the officer]? . . . [T]ake me back to my cell.

A defendant's silence after receiving *Miranda* warnings cannot be used against him as evidence of guilt. *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91 (1976). Although the record in this case does not indicate whether the defendant received *Miranda* warnings, if he did, the State has not violated his right to silence because the prosecutor's comment did not address the defendant's guilt. Again, the prosecutor's comment was directed at the strength of the evidence supporting the nonstatutory mitigating circumstance that the defendant was cooperative in answering the questions of the investigating officers. The prosecuting attorney was merely arguing to the jury that it should not find any mitigating value in the mitigating circumstance. *See State v. Rouse*, 339 N.C. 59, 451 S.E.2d 543 (1994), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 60 (1995).

This assignment of error is overruled.

[16] In his next assignment of error, the defendant argues that the trial court violated his due process rights by failing to inform the jury that he was unlikely ever to be paroled. We addressed this issue and found against the defendant's position in *State v. Jones*, 336 N.C. 229, 443 S.E.2d 48, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 423 (1994), and *State v. Skipper*, 337 N.C. 1, 446 S.E.2d 252. The defendant presents no new arguments that persuade us to reconsider these holdings.

[17] In his next assignment of error, the defendant argues that the court erred by failing to require the jury to consider any mitigating circumstance found in Issue Two when weighing the aggravating circumstances against the mitigating circumstances in Issues Three and Four. The court gave an almost identical charge on this point in *State v. Lee*, 335 N.C. 244, 439 S.E.2d 547, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 162 (1994). We found no error in that case, and the defendant has presented no new argument that persuades us to change our position. This assignment of error is overruled.

[18] The defendant next contends it was error for the court to charge the jury that in order to find a nonstatutory mitigating circumstance, it must find the facts supporting the circumstance to exist and that those facts have mitigating value. We held this was a proper charge in *State v. Hill*, 331 N.C. 387, 417 S.E.2d 765 (1992), *cert. denied*, 507 U.S. 924, 122 L. Ed. 2d 684 (1993). The defendant presents no new

argument which persuades us to change our position. This assignment of error is overruled.

[19] The defendant assigns error to a statement by the court to the jury. After the jury had been excused for the evening meal and seven of the jurors had left the courtroom, the foreman of the jury sent a message to the judge through the bailiff "that one juror wanted to talk to the judge, that the juror could not decide." The judge responded:

> Now, the Court cannot talk to any juror alone. The Court can only make comments in the presence of all twelve jurors. So I ask that all twelve jurors now leave and come back at seven-thirty.

The jurors returned from their recess at 7:30 p.m., and the court instructed them as follows:

> Now, members of the jury, before I ask you to go back into the jury room to continue your deliberations, I would like to inform you of a rule of the Court. The Judge cannot answer a question without all twelve jurors present. If you have any question you wish to have answered, in the jury room agree upon what the question is, have the foreperson write the question down on a piece of paper, and then all—knock on the jury room door and all twelve of you come back into the courtroom. And then at that time the foreperson of the jury can present the written question to the Judge for an answer.

The jury then retired to the jury room. It did not submit a question to the court. The defendant says that the court, by its statement to the jury, imposed a rule that required the assent of all jurors for a single juror to communicate with the court. We disagree.

We read the court's statement to mean that if one or more of the jurors wanted to ask a question of the court, the jury would agree on the form of the question, and the foreman could submit the question in writing to the court. There was no restriction on any question a juror desired to ask.

This assignment of error is overruled.

[20] In his final assignment of error, the defendant contends that the trial court erred by failing to conduct an individual jury poll as required by N.C.G.S. § 15A-2000(b). The defendant argues that the record shows that the foreperson answered the question, "Do you still assent thereto?" for jurors one, two, four, five, six, seven, and eight. The defendant is correct in his assertion that the original transcript

indicated that the foreperson answered the question for those jurors. The transcript has been amended by the court reporter, however, to correct the typographical error of substituting "foreperson" for the juror who was actually answering the question. The amended transcript shows that each juror answered each question in compliance with N.C.G.S. § 15A-2000(b).

This assignment of error is overruled.

We find no error in the trial or sentencing hearing.

PROPORATIONALITY REVIEW

[21]  Finding no error in the trial, it is our duty to determine (1) whether the record supports the jury's finding of aggravating and mitigating circumstances; (2) whether any of the sentences were imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether either of the sentences of death is excessive or disproportionate to the penalty imposed in similar cases. N.C.G.S. § 15A-2000(d)(2); *State v. Robbins,* 319 N.C. 465, 356 S.E.2d 279, *cert. denied,* 484 U.S. 918, 98 L. Ed. 2d 226 (1987). An examination of the record reveals the evidence supports the findings of the aggravating and mitigating circumstances. The defendant does not contend otherwise. We also hold that the sentences were not imposed under the influence of passion, prejudice, or any other arbitrary factor.

Our next task is to determine whether either of the sentences imposed is excessive or disproportionate to the penalties imposed in similar cases. For both crimes, the jury found three aggravating circumstances: (1) the defendant had previously been convicted of a felony involving the use or threat of violence to the person, (2) the murder was committed for pecuniary gain, and (3) the murder was part of a course of conduct in which the defendant engaged that included the commission by the defendant of a crime of violence against another person. N.C.G.S. §§ 15A-2000(e)(3), (6), (11).

Twenty-eight mitigating circumstances were submitted to the jury. One or more jurors found eleven of them, none of which were statutory mitigating circumstances.

This Court gives great deference to a jury's recommendation of a death sentence. *State v. Quesinberry,* 325 N.C. 125, 145, 381 S.E.2d 681, 694 (1989), *sentence vacated on other grounds,* 494 U.S. 1022, 108 L. Ed. 2d 603 (1990). In only seven cases have we found a death

sentence disproportionate. *See State v. McCollum,* 334 N.C. 208, 240-42, 433 S.E.2d 144, 162-63 (1993), cert. denied, —— U.S. ——, 129 L. Ed. 2d 895 (1994). In several cases which have characteristics similar to this case, we have affirmed the imposition of the death penalty.

We note first that this Court has never found a death sentence disproportionate when a defendant was convicted of more than one murder. *State v. Garner,* 340 N.C. 573, 610, 459 S.E.2d 718, 738 (1995). In fact, the defendant's status as a multiple killer is a "heavy factor to be weighed against the defendant." *State v. Laws,* 325 N.C. 81, 123, 381 S.E.2d 609, 634 (1989), *sentence vacated on other grounds,* 494 U.S. 1022, 108 L. Ed. 2d 603 (1990).

We found the death sentence not disproportionate in *State v. Gardner,* 311 N.C. 489, 319 S.E.2d 591, in which the jury found two of the same aggravating circumstances found in this case, that the murder was committed for pecuniary gain and that the murder was part of a course of conduct which included the commission of crimes of violence against another person. We also found the death sentence not disproportionate in *State v. Green,* 336 N.C. 142, 443 S.E.2d 14, *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 547 (1994), and *State v. Miller,* 339 N.C. 663, 455 S.E.2d 137, *cert. denied,* —— U.S. ——, 133 L. Ed. 2d 169 (1995). In both of those cases, the jury found the same three aggravating circumstances found in this case.

We are impressed with the brutality and the wanton disregard for human life present in this case. The defendant beat and stabbed the victims to facilitate a robbery. When the killings in this case are compared to those in the cases listed above in which death sentences were imposed, the similarity of the characteristics of the cases convinces us that the penalties imposed in this case are not excessive or disproportionate to the penalties imposed in similar cases, considering the crimes and the defendant.

We hold that the defendant received a trial and sentencing hearing free of prejudicial error; that the aggravating circumstances found were supported by the evidence; that the sentences of death were not imposed under the influence of passion, prejudice, or any other arbitrary factor; and that the sentences of death are not excessive or disproportionate to the penalties imposed in similar cases.

NO ERROR.