STATE OF NORTH CAROLINA v. BRIAN MICHAEL BLAKEMAN

No. COA09-699

(Filed 2 February 2010)

**1. Evidence— motion to suppress statements—plain error analysis**

The trial court did not commit plain error in a statutory sexual offense and multiple indecent liberties case by denying defendant's motion to suppress his statements to law enforcement

---

officers. Defendant failed to renew his objection at trial, and on cross-examination he elicited extensive testimony about these same statements. Further, defendant failed to argue that the jury probably would have reached a different verdict absent this alleged error.

**2. Appeal and Error— preservation of issues—failure to argue or assign as plain error**

The trial court did not err in a statutory sexual offense and multiple indecent liberties case by admitting certain cross-examination testimony concerning a prior incident with defendant's niece because defendant neither objected to this testimony nor assigned it as plain error.

**3. Criminal Law— prosecutor's argument—personal experience—arguments outside record**

The trial court did not err in a statutory sexual offense and multiple indecent liberties case by failing to intervene *ex mero motu* during certain parts of the State's closing argument that injected personal experience and made arguments outside the record because each of these issues was pertinent to evidence introduced at trial, to defense counsel's closing argument, or to both.

**4. Sentencing— aggravating factor—took advantage of position of trust or confidence**

The trial court erred in a statutory sexual offense and multiple indecent liberties case by denying defendant's motion to dismiss the aggravating factor under N.C.G.S. § 15A-1340.16(d)(15) that defendant took advantage of a position of trust or confidence because there was no evidence that defendant had any role in the minor victim's life other than being her friend's stepfather. The evidence showed only that the minor victim trusted defendant in the same way she might trust any adult parent of a friend.

Appeal by Defendant from judgments entered 25 and 26 September 2008 by Judge Thomas H. Lock in Johnston County Superior Court. Heard in the Court of Appeals 17 November 2009.

*Attorney General Roy Cooper, by Special Deputy Attorney General Robert M. Curran, for the State.*

*McCotter, Ashton & Smith, P.A., by Rudolph A. Ashton, III, and Kirby H. Smith, III, for Defendant.*

BEASLEY, Judge.

Defendant (Brian Blakeman) appeals from judgments entered upon his convictions of one count of statutory sexual offense, five counts of indecent liberties, and habitual felon status. We concluded that there was no error at trial but remand for resentencing.

In October 2007 Defendant was indicted on five counts of taking indecent liberties with a child, in violation of N.C. Gen. Stat. § 14-202.1; one count of statutory sexual offense in violation of N.C. Gen. Stat. § 14-27.7A(a); and for habitual felon status, in violation of N.C. Gen. Stat. § 14-7.1. The charges included two counts alleging sexual offenses committed against "Kathy" and four sexual offenses committed against "Ann."[1] The trial court denied the State's motion to join charges alleging sexual abuse of both victims for trial. The trial court first held the trial where Defendant was charged with sexual offense and indecent liberties committed against Kathy.

Defendant was tried before a Johnston County jury in September 2008. Kathy testified that she was born in 1993 and that in April 2007 she was thirteen-years-old. Kathy and Ann were "very close." Ann lived with her mother, the Defendant, and her younger sister Barbara[2]. Kathy testified that Defendant touched her inappropriately during an April 2007 overnight visit to Ann's house. When Kathy arrived on Friday afternoon, Defendant asked her for a hug. Ann's family had recently found a baby squirrel. When Kathy and Ann went with Defendant to buy squirrel food, Kathy rode in the front seat and Defendant held Kathy's hand during the drive.

Kathy spent Friday night at Ann's house. On Saturday morning Kathy awoke before Ann, and went to the living room. Defendant was sitting on the couch and Barbara was on the floor playing with the baby squirrel. Defendant told Barbara to take the squirrel to her room, and asked Kathy to sit next to him on the couch. When Kathy sat down, Defendant put his arm around her shoulder, then reached down under her shirt and beneath her bra, and squeezed her breast. After fondling her breast, Defendant stuck his hand down her pants, inserted his fingers in her vagina and moved his fingers "in and out, probably about four times." Defendant also pulled Kathy close and stuck his tongue in her mouth. Kathy was curled up in a corner of the couch and Defendant was leaning over her, when Ann came into the

---

1. To protect their privacy and for ease of reading, the minor victims are referred to in this opinion by the pseudonyms Kathy and Ann.

2. Barbara is used as a pseudonym for Ann's younger sister.

living room. Defendant moved away and Kathy got up from the couch. She followed Ann out of the living room, and told her that Defendant had touched her.

Later that day, Defendant took Barbara, Ann, and Kathy fishing at a nearby lake and Ann and Kathy talked privately. When Kathy told Ann the details of her encounter with Defendant, Ann started crying and told Kathy that Defendant had "been touching her" since she was seven-years-old. Ann made Kathy promise not to reveal the incident to anyone, because she feared that disclosure of Defendant's behavior would "ruin" her family. Kathy went home after the fishing trip. Before she left, Defendant told Kathy not to tell anyone what had happened and tried to kiss her.

Kathy wrote a note to her boyfriend David[3] about the incident and about a month later, David's grandmother found the note. David's grandmother showed the note to David's mother, who called Kathy's mother. Kathy and her mother went to David's house, where David's mother showed Kathy's mother the note. Kathy told her mother that Defendant had molested her. Kathy's mother called the police and Kathy talked with several law enforcement officers and a social worker from Johnston County Department of Social Services (DSS). After Kathy's mother reported the incident to the police, Ann's family moved to Connecticut, and Kathy had no further contact with Ann before the trial. Kathy testified that when Defendant molested her she felt scared, disgusted, and "stuck." She was reluctant to reveal that Defendant had touched her, because she felt scared and embarrassed. After she was molested by Defendant, Kathy began to feel self-conscious about her body. Kathy's trial testimony was corroborated by that of other witnesses for the State.

Johnston County Sheriff's Department Detective Brian Johnson testified that in May 2007 he was an investigator assigned to the property crimes division. On 30 May 2007 Detective Johnson was working with Detective Ryan Benson, an investigator assigned to the Johnston County Sheriff's Department major crimes division. They were dispatched to Kathy's house to investigate alleged sexual abuse. After interviewing Kathy and her mother, the officers went to Defendant's house. Detective Johnson recalled that Defendant first said he might have touched Kathy's breast when the squirrel was running around on the couch, and later admitted "he did touch her tit." Defense counsel cross-examined Detective Johnson extensively regarding Defendant's

---

3. David is also a pseudonym.

statements to the law enforcement officer, and questioned Detective Johnson about Defendant's exact language and whether Defendant might have said breast instead of "tit."

Detective Benson arrived at Defendant's house at around 11:30 p.m. The detectives interviewed Defendant on his front porch. Defendant corroborated Kathy's testimony that she sat in the front seat on their trip to buy squirrel food. He denied holding her hand, but admitted he might have "accidentally" touched her hand while shifting gears. Defendant told the officers that he had always gotten along with Kathy, who "would come up to him and open her arms up for a hug." Defendant corroborated Kathy's testimony that she sat with him on the couch on Saturday morning, but told the officers that Barbara and the baby squirrel had been in the living room with them. Defendant told the officers that he knew he was accused of "touching" Kathy, and initially said he "had never touched" Kathy. Later he said that he "may have touched [Kathy's] breast while the squirrel was running around the couch."

After the initial interview with Defendant, Detective Benson spoke with Ann and her mother, while Defendant remained on the porch with Detective Johnson. Thereafter, Detective Benson told Defendant "I believe you touched her" and "I need to know exactly how you touched her." Defendant responded by saying "[a]ll right, I touched her tits." Detective Benson asked Defendant to explain, and Defendant then told the officers that, as he and Kathy sat on the couch, Kathy "took his left hand and placed it between her tits." Defendant said that he removed his hand from Kathy's breasts, and denied any other inappropriate contact with Kathy.

Following the presentation of evidence, the jury found Defendant guilty of statutory sexual offense and indecent liberties. The jury also found the existence of the aggravating factor that Defendant "took advantage of a position of trust or confidence to commit the offense." Defendant then pled guilty to attaining habitual felon status, and entered an "Alford" plea[4] to committing four counts of indecent liberties against Ann, reserving the right to appeal the denial of his pretrial motion to suppress his statements to law enforcement officers. Defendant was sentenced to consecutive prison terms of 360 to 441 and 108 to 139 months imprisonment for statutory sex offense and

4. "The Alford plea permitted defendant to 'consent to the imposition of a prison sentence even if he was unwilling or unable to admit his participation in the acts constituting the crime.' " *State v. Meynardie*, 172 N.C. App. 127, 134, 616 S.E.2d 21, 26 (2005) (quoting *North Carolina v. Alford*, 400 U.S. 25, 37, 27 L. Ed. 2d 162, 171 (1970)).

indecent liberties against Kathy, and a consolidated sentence of 21 to 26 months for the indecent liberties against Ann, to be served concurrently with the sentences for his offenses against Kathy. From these judgments and convictions, Defendant appeals.

**[1]** Defendant first argues that the trial court erred by denying his motion to suppress his statements to law enforcement officers. Defendant moved to suppress his statements on the grounds that, at the time he admitted touching Kathy's breast, he was effectively in custody and was entitled to a warning of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). Defendant acknowledges that he failed to renew his objection at trial, but contends that the admission of his statements constituted reversible plain error. We disagree.

"A reversal for plain error is only appropriate in the most exceptional cases." *State v. Raines*, 362 N.C. 1, 16, 653 S.E.2d 126, 136 (2007) (internal quotations and citation omitted). "Plain error is error 'so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached.'" *State v. Wilkerson*, 363 N.C. 382, 412, 683 S.E.2d 174, 193 (2009) (quoting *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987)). Accordingly, "'[t]o prevail, the defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result.'" *State v. Haselden*, 357 N.C. 1, 13, 577 S.E.2d 594, 602 (2003) (quoting *State v. Roseboro*, 351 N.C. 536, 553, 528 S.E.2d 1, 12 (2000)).

As discussed above, Defendant filed a pretrial motion to suppress his statements to law enforcement officers, but failed to renew his objection at trial. Moreover, on cross-examination, Defendant elicited extensive testimony about these same statements. In *State v. Quick*, 329 N.C. 1, 31, 405 S.E.2d 179, 197 (1991), the Supreme Court of North Carolina held:

"[t]he general rule is that when evidence is admitted over objection and the same evidence is thereafter admitted without objection, the benefit of the objection is lost. . . . The absence of a motion to strike or a request for curative instructions, coupled with the fact that defendant elicited evidence of the same or similar import on cross-examination, waived the benefit of the objection."

(quoting *State v. Smith,* 290 N.C. 148, 163, 226 S.E.2d 10, 19 (1976)). Similarly, in *State v. Coley,* —— N.C. App. ——, ——, 668 S.E.2d 46, 52 (2008), *disc. review denied,* 363 N.C. 132, 673 S.E.2d 664 (2009), this Court held that " '[e]rroneous admission of evidence may be harmless . . . where defendant elicits similar testimony on cross-examination.' " (quoting *State v. Weldon,* 314 N.C. 401, 411, 333 S.E.2d 701, 707 (1985)). We conclude that, even had Defendant renewed his suppression motion, his own cross-examination would have rendered harmless any error in admission of his statements.

Defendant also bases his contention on an incorrect legal standard. Defendant asserts that the trial court's "failure to reconsider this issue" . . . constitutes plain error, in that a different verdict <u>may have resulted,</u> but for this error. A different verdict was <u>possible</u>[.]" (emphasis added). As discussed above, " 'defendant has the burden of showing that . . . a different result <u>probably</u> would have been reached but for the error or . . . that the error was so fundamental as to result in a miscarriage of justice or denial of a fair trial.' " *Coley,* —— N.C. App. at ——, 668 S.E.2d at 52 (quoting *State v. Bishop,* 346 N.C. 365, 385, 488 S.E.2d 769, 779 (1997)) (emphasis added). This Court has held:

> [p]rejudicial error [occurs] "when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C. Gen. Stat. § 15A-1443 [(2007)]. A "reasonable possibility" of a different result at trial is a much lower standard than that a different result "probably" would have been reached at trial, which is what this Court must find for there to be plain error.

*State v. Pate,* 187 N.C. App. 442, 448-49, 653 S.E.2d 212, 217 (2007) (citing *State v. Walker,* 316 N.C. 33, 39, 340 S.E.2d 80 (1986)). Defendant does not argue that, had his statement been excluded, the jury probably would have reached a different verdict, and we discern no such probability. This assignment of error is overruled.

---

**[2]** Defendant next argues that the trial court committed reversible error by admitting certain cross-examination testimony. On cross-examination, Defendant was asked about an incident alleged to have occurred between Defendant and his niece more than twenty years earlier. The prosecutor asked Defendant whether, when he was twenty-one-years-old and his niece was thirteen-years-old, Defendant

had inserted his finger in his niece's vagina. Defendant denied that this incident occurred and the matter was dropped. Defendant did not object to the introduction of this testimony at trial, but argues on appeal that its admission was reversible error. We disagree.

Defendant asserts that "N.C. Gen. Stat. § 15A-1446(d)(6) provides errors based upon the Constitution of the United States or the Constitution of North Carolina require no objection at trial and are reviewed *de novo,* on appeal." Defendant misstates the statute, which actually provides that:

(d) Errors based upon any of the following grounds . . . may be the subject of appellate review even though no objection, . . . has been made in the trial division. . . . (6) The defendant was <u>convicted under a statute</u> that is in violation of the Constitution of the United States or the Constitution of North Carolina. (emphasis added).

N.C. Gen. Stat. § 15A-1446(d)(6) (2007). Because Defendant does not allege that he was convicted under an unconstitutional statute, N.C. Gen. Stat. § 15A-1446(d)(6) is irrelevant to our review.

Defendant neither objected to the cross-examination testimony at issue, nor assigned it as plain error. On appeal, Defendant makes a conclusory allegation that admission of this testimony was plain error. However, he does not argue that admission of this evidence had a probable effect on the trial's outcome and our own review of the evidence reveals no likelihood that this brief cross-examination affected the jury's verdict.

Defendant's empty assertion of plain error, without supporting argument or analysis of prejudicial impact, does not meet the spirit or intent of the plain error rule. By simply relying on the use of the words 'plain error' as the extent of his argument in support of plain error, defendant has effectively failed to argue plain error and has thereby waived appellate review.

*State v. Cummings,* 352 N.C. 600, 637, 536 S.E.2d 36, 61 (2000). This assignment of error is overruled.

---

[3] Next, Defendant argues that the trial court committed plain error by failing to intervene *ex mero motu* during certain parts of the State's closing argument. We disagree.

Defendant correctly cites the general rule that

[d]uring a closing argument to the jury an attorney may not become abusive, inject his personal experiences, . . . or make arguments on the basis of matters outside the record[.] . . . An attorney may, however, on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue.

N.C. Gen. Stat. § 15A-1230(a) (2007). However:

"We will not find error in a trial court's failure to intervene in closing arguments *ex mero motu* unless the remarks were so grossly improper they rendered the trial and conviction fundamentally unfair." "[O]nly an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting ex mero motu an argument that defense counsel apparently did not believe was prejudicial when originally spoken."

*State v. Garcell*, 363 N.C. 10, 61, 678 S.E.2d 618, 650 (2009) (quoting *State v. Raines*, 362 N.C. 1, 14, 653 S.E.2d 126, 134 (2007); and *State v. Mann*, 355 N.C. 294, 307, 560 S.E.2d 776, 785 (2002)).

In the instant case, Defendant asserts that the trial court "allow[ed] the State to inject personal experiences and to make arguments outside of the record during its closing argument." We disagree.

Defense counsel made the first closing argument to the jury, and argued to the jury that:

[t]here was no physical evidence that Kathy had been sexually abused and no witnesses to the alleged sexual abuse, effectively reducing the trial to conflicting testimony by "an alleged victim" and Defendant.

Defendant was surprised when he was confronted with allegations that he had "touched" Kathy, and told law enforcement officers that he "never" touched Kathy because he knew he had done nothing inappropriate.

Detective Benson's summary of his interview with Defendant may have included errors or typos.

Defendant told the officers he might have touched Kathy's breast while moving the squirrel, to explain an inadvertent touching.

The State's evidence contained significant inconsistencies, including whether Kathy's note expressly stated that she had been molested, whether she told Deputy Ackley that Defendant made her touch his penis outside or inside his pants, whether Defendant held her hand during the entire car ride or just part of the time, and whether Ann asked Kathy not to tell anyone or for a "promise" not to tell. Ann's testimony contained "big differences" from her earlier statements, including whether she and Kathy made an explicit "promise" not to tell anyone, and whether it was physically possible for Defendant to hold Kathy's hand "the whole time" while operating a manual gear shift. These inconsistencies were "new things that walked in this courtroom" and were "things that I believe you'd have heard about."

It was significant that Kathy delayed a month before reporting the alleged sexual abuse. Kathy's testimony that she delayed because of a promise to Ann was contradicted by the absence of the word "promise" in her interviews with law enforcement officers and others.

Ann did not tell her mother the details of her alleged abuse by Defendant. The State's evidence about Ann's reluctance to come forward contained significant inconsistencies.

Defendant was "a simple guy, a laborer, doing the best he can" and never abused either girl. Discrepancies between Defendant's statements to law enforcement officers and his trial testimony were minor, and resulted from the officers' failure to ask him about specific issues during the interview. Discrepancies in Defendant's statements were minor, and the "really important thing in [Defendant's] story" was that he consistently denied digitally penetrating Kathy, kissing her, or putting his hand under her bra.

At the beginning of the prosecutor's closing argument he told the jury that he had planned a speech for them but that, after hearing Defendant's closing argument, he felt the need to "talk to you about his obstacles to the truth, the myths that are associated with child sexual abuse." He characterized certain issues raised at trial and in Defendant's closing argument as "myths" and attempted to persuade the jury not to accept them.

The prosecutor first told the jury that the belief that "this kind of stuff just doesn't happen" was inaccurate, and that during his experience as a prosecutor specializing in child sexual abuse cases he had

heard "child after child" who "had experienced the same thing that these children have experienced." Although Defendant did not object to this, the trial court warned the prosecutor *ex mero motu* to "confine your arguments to matters in the record in this case." The prosecutor then addressed the following issues, which he characterized as "myths" about child sexual abuse:

> That sexual abusers are recognizable and are "usually a stranger" to the abused child.

> That "children who are sexually abused will immediately disclose [the abuse]."

> That a victim of child sexual abuse "will yell and scream and fight."

> That there will be physical evidence if the vagina of a thirteen year old victim is digitally penetrated.

> That a child who is repeatedly abused will remember details of specific incidents and will use the same language every time she recounts an incident of abuse.

"The prosecutor may . . . respond to comments critical of the State's investigation and witnesses made by defense counsel in closing argument in order to restore the credibility of the State's witnesses[.]" *State v. Trull*, 349 N.C. 428, 453, 509 S.E.2d 178, 194 (1998) (citations omitted). For example, in *State v. Best*, 342 N.C. 502, 517, 467 S.E.2d 45, 55 (1996), the prosecutor in closing argument "used the term 'cock-and-bull mess' to refer to the contention made by defense counsel in closing argument that the investigators should have [conducted a certain forensic examination.]" The Supreme Court of North Carolina held that "the prosecutor was merely responding to the [Defendant's] contention[.]"

We conclude that each of these issues was pertinent to evidence introduced at trial, to defense counsel's closing argument, or to both. This assignment of error is overruled.

---

**[4]** Finally, Defendant argues that the trial court erred by denying his motion to dismiss the aggravating factor submitted to the jury. We agree.

Under N.C. Gen. Stat. § 15A-1340.16(a) and (a1) (2007):

> (a) The court shall consider evidence of aggravating or mitigating factors present in the offense . . . but the decision to

depart from the presumptive range is in the discretion of the court. The State bears the burden of proving beyond a reasonable doubt that an aggravating factor exists[.]

(a1) The defendant may admit to the existence of an aggravating factor[.] . . . If the defendant does not so admit, only a jury may determine if an aggravating factor is present in an offense. . . .

In this case, the jury found beyond a reasonable doubt that Defendant "took advantage of a position of trust or confidence, including a domestic relationship, to commit the offense." Under N.C. Gen. Stat. § 15A-1340.16(d)(15) (2007), this constitutes an aggravating factor.

[D]efendant contends that . . . the record lacked sufficient evidence to support the trial court's finding as an aggravating factor that he took advantage of a position of trust or confidence. N.C.G.S. § 15A-1340.16(d)(15) [(2007)]. We are constrained to agree."

*State v. Mann*, 355 N.C. 294, 318, 560 S.E.2d 776, 791 (2002).

The evidence showed the following regarding Defendant's relationship to Kathy: Kathy testified that in April 2007 she and Ann were close friends and that, after her mother "got to know [Ann] and her parents" Kathy visited Ann's house "a lot." Defendant "seemed like a very nice guy" and when she visited Ann, Defendant would ask her for a hug. Kathy testified that she trusted Defendant because there "was no reason for me not to trust him." Kathy's mother testified that she and Ann's mother worked together and that, after she "felt comfortable" with Ms. Rallis and Defendant, she allowed Kathy to visit at Ann's house. Defendant "seemed like a nice guy" so Ms. Rallis trusted him. Defendant testified that Kathy visited overnight "about eight or ten times" and that he never had any problems with Kathy.

We conclude that this evidence is insufficient to establish that Defendant "took advantage of a position of trust or confidence, including a domestic relationship, to commit the offense." The evidence was undisputed that Kathy required her mother's permission to spend the night with Ann, and had spent the night there no more than ten times. There was no evidence that Kathy's mother had arranged for Defendant to care for Kathy on a regular basis, or that Defendant had any role in Kathy's life other than being her friend's stepfather. There was no evidence suggesting that Kathy, who was thirteen-years-old and lived nearby, would have relied on Defendant for help

in an emergency, rather than simply going home. There was no evidence of a familial relationship between Kathy and Defendant, and no evidence that Kathy and Defendant had a close personal relationship or that Kathy depended or relied on Defendant for any physical or emotional care. The evidence showed only that Kathy "trusted" Defendant in the same way she might "trust" any adult parent of a friend.

The State cites *State v. McGriff*, 151 N.C. App. 631, 566 S.E.2d 776 (2002), and *State v. Bingham*, 165 N.C. App. 355, 598 S.E.2d 686 (2004), in support of its position that there was sufficient evidence to support a finding beyond a reasonable doubt of the existence of this aggravating factor. We find these cases easily distinguishable. In *McGriff*, there was evidence that:

> prior to the incidents leading to these convictions, . . . [the victim] visited [her friend's] house every day after school to babysit, often when there were no adults but defendant in the house. [The victim] had known defendant for approximately two months when he began calling her on the phone, touching her inappropriately, and writing letters to her.

*McGriff*, 151 N.C. App. at 640, 566 S.E.2d at 781-82. In *Bingham*, the victim and her mother had lived with the defendant for months before he began to abuse her. Moreover, both of these cases were decided before the decision of the United States Supreme Court in *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403 (2004). "[A]fter *Blakely*, trial judges may not enhance criminal sentences beyond the statutory maximum absent a jury finding of the alleged aggravating factors beyond a reasonable doubt." *State v. Blackwell*, 361 N.C. 41, 45, 638 S.E.2d 452, 455 (2006).

"The existence of this aggravating factor is premised on a relationship of trust between defendant and the victim which causes the victim to rely upon defendant." *State v. Farlow*, 336 N.C. 534, 542, 444 S.E.2d 913, 918 (1994). In *State v. Mann*, the Supreme Court of North Carolina discussed the evidence required to establish the existence of this aggravating factor:

> In *State v. Daniel*, 319 N.C. 308, 354 S.E.2d 216 (1987), this Court considered the 'trust or confidence' factor.] . . . We held that "such a finding depended instead upon the existence of a relationship between the defendant and victim generally conducive to reliance of one upon the other." Our courts have up-

held a finding of the "trust or confidence" factor in very limited factual circumstances.

*Mann*, 355 N.C. at 318-19, 560 S.E.2d at 791 (citing *Daniel*, 319 N.C. 308, 311, 354 S.E.2d 216, 218 (1987)). We also note that in *Lyons v. Weisner*, 247 Fed. Appx. 440 (4th Cir. 2007), the Fourth Circuit Court of Appeals reviewed this Court's holding in *State v. Lyons*, 162 N.C. App. 722, 592 S.E.2d 294 (2004 N.C. App. LEXIS 1485) (unpublished):

> [T]he State asserts that a position of trust must exist when a minor is left in the care of the defendant overnight. But all of the cases on which the States relies involve very different facts. For, in each of them the minor victim had a familial or other close relationship with the abuser, or was very young and so extremely dependent on the defendant, or both. . . . In the case at hand . . . the victim was not an infant, not six, not nine, but fifteen-years old; moreover, he was neither related in any way to [defendant] nor did he have a particularly close relationship with [defendant].

*Lyons v. Weisner*, 247 Fed. Appx. at 445-46. The Court also noted that:

> [t]he North Carolina Court of Appeals in this case concluded that the facts were "sufficient" to support a finding of the aggravating factor; but that court operated under a pre-*Blakely* regime where the trial judge needed to find the facts supporting the aggravating factor only by a preponderance of the evidence. That holding does not affect our conclusion that we have grave doubt whether a jury could have found the facts supporting the aggravating factor beyond a reasonable doubt.

*Id.* at 446 n.3. Although we are not bound by the holding of *Lyons v. Weisner*, we find it persuasive. We conclude that the trial court erred by denying Defendant's motion to dismiss the aggravating factor.

For the reasons discussed above, we find no error in Defendant's convictions and remand for resentencing.

No error at trial; Remanded for resentencing.

Judges WYNN and CALABRIA concur.