STATE OF NORTH CAROLINA v. SAMMY CRYSTAL PERKINS

No. 60A94

(Filed 10 February 1997)

**1. Jury §§ 223, 226 (NCI4th)— capital trial—jury selection— death penalty views—excusal for cause—rehabilitation not allowed**

The trial court did not err in excusing a prospective juror for cause based on the juror's answers to the court's death-qualification questions where the juror told the court that he could follow the law as explained to him by the court with respect to the sentencing procedure, but he also stated that he did not know whether he "could vote on the death penalty" and that he was "unable to respond" to a question asking whether he would be able or unable to recommend a death sentence if the State proved its case beyond a reasonable doubt. Nor did the trial court err in refusing to allow defendant to attempt to rehabilitate this juror since the juror did not know his position on the issue, and it cannot be concluded that he would likely have answered the dispositive questions differently if the court had allowed defendant to ask him additional questions.

**Am Jur 2d, Jury § 279.**

**Comment note on beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**2. Jury § 226 (NCI4th)— capital trial—jury selection—death penalty views—excusal for cause**

The trial court did not err in excusing for cause in a capital trial three prospective jurors who were unequivocal about their inability to vote for the death penalty without allowing defendant to attempt to rehabilitate the jurors since additional questioning by defendant would not likely have procured different responses.

**Am Jur 2d, Jury § 279.**

**Comment note on beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

STATE v. PERKINS

[345 N.C. 254 (1997)]

3. Jury § 232 (NCI4th)— capital trial—death penalty views—
excusal for cause—larger percentage of blacks excluded—
no violation or equal protection or fair cross-section

Defendant's rights to equal protection and to a jury selected
from a fair cross-section of the community were not violated by
the fact that only five percent of white veniremen were excused
for their opposition to the death penalty while thirty-five percent
of black veniremen were so excused where defendant did not
prove that any prospective juror was excluded on the basis of his
or her race. Merely showing a disproportionate impact on the
racial composition of the jury is not sufficient to establish a vio-
lation of federal or state constitutional rights.

**Am Jur 2d, Criminal Law § 684; Jury § 244.**

**Use of peremptory challenge to exclude from jury per-
sons belonging to a class or race. 79 AL43d 14.**

**Use of peremptory challenges to exclude ethnic and
racial groups, other than black Americans, from criminal
jury—post-*Batson* state cases. 20 ALR5th 398.**

4. Jury § 215 (NCI4th)— capital trial—jury selection—juror
"more than likely" to vote for death—rehabilitation—
denial of challenge for cause

The trial court did not err by failing to excuse for cause a
prospective juror who asserted during individual *voir dire* about
pretrial publicity that he would "more than likely" vote for death
if defendant were convicted where, later in the *voir dire* after the
jury's duties had been more fully explained, the juror stated that
he would not automatically vote for the death penalty regardless
of the evidence if defendant were convicted of first-degree mur-
der, and the juror also told the court that he would follow the law
of North Carolina as the court would explain it as to the sentence
recommendation to be made by the jury.

**Am Jur 2d, Criminal Law § 685.**

**Comment note on beliefs regarding capital punishment
as disqualifying juror in capital case—post-*Witherspoon*
cases. 39 ALR3d 550.**

STATE v. PERKINS

[345 N.C. 254 (1997)]

**5. Jury § 201 (NCI4th)— jury selection—all elements not proven—hesitancy to return not guilty verdict—ability to follow law—denial of challenge for cause**

The trial court did not err by its denial of defendant's challenge for cause of a juror who stated that he might be hesitant about returning a verdict of not guilty if the State proved three of the four elements of a crime and the three heavily outweighed the one where, during the colloquy about finding defendant not guilty if all the elements of the crime were not proven, the juror stated unequivocally that he would follow the law as explained to him by the court, and the juror subsequently stated unequivocally that even if he thought defendant might be guilty but was not satisfied beyond a reasonable doubt, he would not hesitate to find defendant not guilty. The prospective juror's answers did not demonstrate that he would be unable to properly apply the law on the presumption of innocence or that he would not be a fair and impartial juror.

**Am Jur 2d, Jury §§ 226, 291.**

**6. Jury § 203 (NCI4th)— jury selection—knowledge of another murdered girl—strong feelings—ability to be impartial—denial of challenge for cause**

The trial court in a prosecution for the first-degree murder and rape of a seven-year-old girl did not err by the denial of defendant's challenge for cause of a prospective juror who stated during *voir dire* that he had known a young girl who was murdered and that he had strong feelings about it which he would likely take into the jury room where the juror thereafter told the court that his strong feelings would not prevent him from being a fair and impartial juror.

**Am Jur 2d, Jury §§ 226, 291.**

**Fact that juror in criminal case, or juror's relative or friend, has previously been victim of criminal incident as ground of disqualification. 65 ALR4th 743.**

**7. Criminal Law § 78 (NCI4th Rev.)— pretrial publicity— denial of venue change**

The trial court in a prosecution for the first-degree murder and rape of a seven-year-old girl did not err in denying defendant's motion for a change of venue on the ground of pretrial pub-

licity where ten prospective jurors who indicated that they had formed an opinion based on pretrial publicity were excused; several of the jurors selected to serve had not heard of the case; and those jurors who had learned of the case through television, newspapers, or word of mouth stated that they had not formed an opinion about the case and that they could set aside any such information. N.C.G.S. § 15A-957.

**Am Jur 2d, Criminal Law §§ 389, 390, 688, 841; Homicide § 204; Venue § 59.**

**Pretrial publicity in criminal case as ground for change of venue. 33 ALR3d 17.**

8. **Criminal Law § 532 (NCI4th Rev.)— alleged juror misconduct—conversation with baby-sitter—mistrial denied**

The trial court in a first-degree murder case did not err by the denial of defendant's motion for a mistrial or, in the alternative, for the removal of a juror for misconduct when it was reported to the court during the trial that the juror had told her baby-sitter that the jury had decided that defendant was guilty and, except for one holdout, believed that defendant should be put to death where the court conducted a hearing out of the presence of the jury; the evidence was unclear regarding when the purported conversation took place and what, if anything, was said about the case; the juror testified that she had not been to the baby-sitter's home the day the conversation allegedly took place; upon extensive examination by the court, all jurors denied having formed or expressed any opinion as to defendant's guilt or the sentence to be imposed if he were found guilty; and the trial court found that it could not determine the content of the conversation between the juror and her baby-sitter, that all jurors denied having formed an opinion as to the guilt or innocence of defendant or the punishment to be imposed, and that no juror misconduct had occurred. Even if the incident happened as described by the baby-sitter, no outside influence was exerted on the jury.

**Am Jur 2d, Criminal Law § 914.**

**Contacts between alternate and other jurors or outsiders as reversible error. 84 ALR2d 1288.**

**9. Evidence and Witnesses § 3070 (NCI4th)— videotaped interview—admissibility for impeachment—exclusion not prejudicial error**

Assuming that a child psychologist's videotaped interview of a seven-year-old murder and rape victim's brother, who was present in the room when his sister died, was properly authenticated and admissible to impeach a juvenile investigator's testimony that the brother had told her that defendant had bitten his finger, watched a "nasty" tape, and "made [the victim] dead," and that he mentioned a pillow, defendant was not prejudiced by the trial court's exclusion of the videotape where the videotape shows that, although the brother did have some difficulty expressing himself and answering questions, he did state that defendant put a "pillow on [the victim's] head" and "her died," which comments were consistent with the investigator's testimony; defendant admitted placing a pillow on the victim's face; the physical evidence suggested the victim had been smothered and raped; the victim's cousin testified that he saw defendant on top of the victim, that a pillow was on the victim's face, and that defendant was having sex with her; and no reasonable possibility exists that the result would have been different but for the trial court's failure to admit the videotape.

**Am Jur 2d, Appellate Review § 759; Constitutional Law § 848; Criminal Law § 196; Homicide § 560.**

**10. Evidence and Witnesses § 929 (NCI4th)— statements by victim's brother—admissible as excited utterances**

In a prosecution for the murder and rape of a seven-year-old girl, statements made by the victim's three-year-old brother to a juvenile investigator that defendant had bitten him while he was on the bed with the victim, that defendant made him watch a "nasty tape," that "mommy woke up and [the victim] was dead," and that defendant "made her dead" were properly admitted under the excited utterance exception to the hearsay rule where the statements were made ten hours after the murder and one hour after the body was discovered; the brother had been through the startling experience of witnessing the victim's death; and his statements were spontaneous and not fabricated or the result of second-hand information.

**Am Jur 2d, Evidence §§ 861, 865, 879, 882.**

Instructions to jury as to credibility of child's testimony in criminal case. 32 ALR4th 1196.

11. **Criminal Law § 460 (NCI4th Rev.)— capital trial—closing argument—consideration of both theories of first-degree murder—greater sentencing options—impropriety cured by instructions**

Any impropriety in the prosecutor's closing argument that the jury should find defendant guilty under both theories of first-degree murder because "that gives the judge a greater option with regard to punishment" and any error in the trial judge's failure to intervene were cured by the trial court's correct instruction to the jury on the legal standard it was to apply in determining guilt and on the effect of the State's failure to carry its burden of proving guilt beyond a reasonable doubt. It does not appear that the jury rendered a guilty verdict based on the prosecutor's argument about the potential for greater punishment rather than on the overwhelming evidence of defendant's guilt.

**Am Jur 2d, Trial §§ 587, 711.**

12. **Evidence and Witnesses § 2965 (NCI4th)— defense psychologist—cross-examination proper to show bias—allegation of misconduct—cross-examination not prejudicial error**

The State's cross-examination of a forensic psychologist who testified for defendant as to whether he had been fired, removed, or transferred from the forensic unit at Dorothea Dix Hospital for misconduct was relevant to show that the witness may have been biased against the State. Assuming *arguendo* that the trial court erred by permitting the prosecutor to inquire into an allegation that the witness had made improper advances to a patient, this error was not prejudicial to defendant in light of the witness's denial of any misconduct and the overwhelming evidence of defendant's guilt of the crimes charged.

**Am Jur 2d, Evidence § 495; Expert and Opinion Evidence § 95.**

**13. Criminal Law § 1337 (NCI4th Rev.); Evidence and Witnesses § 281 (NCI4th)— capital sentencing—character evidence—rebuttal—cross-examination of witness—accusation against defendant**

Defendant placed his character in issue in a capital sentencing proceeding when a defense witness read from letters defendant had written to her in which defendant stated that he was a "pretty good person," that he thought "about the Lord daily," and that he knew he should give his life to the Lord. Therefore, the State was entitled to rebut this evidence of good character by asking the witness on cross-examination whether she had accused defendant of raping her daughter in 1978.

**Am Jur 2d, Evidence § 431.**

**Prejudicial effect of prosecutor's comment on character or reputation of accused, where accused has presented character witnesses. 70 ALR2d 559.**

**14. Criminal Law § 1342 (NCI4th Rev.)— capital sentencing—evidence of prior conviction—time actually served—absence of prejudice**

Evidence elicited by the prosecutor on cross-examination of defendant in a capital sentencing proceeding that defendant had been sentenced to fifteen years in prison for attempted first-degree rape was admissible to establish the aggravating circumstance that defendant had previously been convicted of a felony involving the use or threat of violence to the person. Assuming *arguendo* that evidence of the length of time served by defendant pursuant to this conviction was not relevant in a capital sentencing proceeding, defendant was not prejudiced by the admission of such evidence where evidence that defendant received the fifteen-year sentence in 1981 and killed the victim in this case in 1992 demonstrated that defendant obviously did not serve his entire sentence, the State presented substantial evidence establishing defendant's guilt and supporting each of the aggravating circumstances, and no reasonable possibility exists that a different result would have been reached at trial if the trial court had excluded this evidence.

**Am Jur 2d, Criminal Law § 598; Evidence §§ 341, 445; Rape § 71.**

STATE v. PERKINS

[345 N.C. 254 (1997)]

Necessity and sufficiency of cautionary instructions, in prosecution for rape, as to evidence of other similar offense. 77 ALR2d 906.

Supreme Court's views as to what comments by prosecuting attorney constitute violation of accused's privilege against self-incrimination under Federal Constitution's Fifth Amendment. 99 L. Ed. 2d 926.

15. **Criminal Law § 1348 (NCI4th Rev.)— capital sentencing— prior conviction—length of time served—parole issue not raised**

The prosecutor's cross-examination of defendant in a capital sentencing proceeding about the length of time he served for a prior attempted rape conviction did not raise the issue of defendant's eligibility for parole in the event the jury recommended a life sentence and did not entitle defendant to an instruction on parole eligibility.

Am Jur 2d, Criminal Law § 918; New Trial § 247; Trial § 575.

Prejudicial effect of statement or instruction of court as to possibility of parole or pardon. 12 ALR3d 832.

16. **Criminal Law § 453 (NCI4th Rev.)— capital sentencing— closing argument—jurors in place of victim—no due process violation**

The prosecutor's closing argument in a capital sentencing proceeding asking the jurors to put themselves in the position of the seven-year-old rape and murder victim was improper, but this argument did not deny defendant due process where the argument did not manipulate or misstate the evidence; the argument did not implicate any specific rights of the accused, such as the right to counsel or the right to remain silent; the State's evidence was overwhelming that defendant raped and smothered the victim and strongly supported each of the aggravating circumstances found by the jury; and it is unlikely that the jury's decision was influenced by this argument.

Am Jur 2d, Homicide §§ 463, 560; Trial § 706.

Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.

STATE v. PERKINS

[345 N.C. 254 (1997)]

Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.

**17. Criminal Law § 468 (NCI4th Rev.)— capital sentencing— closing argument not supported by evidence—no due process violation**

Even if the evidence did not support the prosecutor's closing argument in a capital sentencing proceeding that defendant killed the victim to prevent her from testifying against him, this argument did not violate defendant's right to due process.

**Am Jur 2d, Appellate Review §§ 713, 753.**

**Propriety and prejudicial effect of prosecuting attorney's arguing new matter or points in his closing summation in criminal trial. 26 ALR3d 1409.**

**Whether admission of evidence at criminal trial in violation of Federal Constitutional rule is prejudicial error or harmless error, Supreme Court cases. 31 L. Ed. 2d 921.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

**18. Criminal Law § 439 (NCI4th Rev.)— capital sentencing— closing argument—remarks about defendant**

The trial court did not err by overruling defendant's objections to remarks of the prosecutor in his closing argument in a capital sentencing proceeding that "to describe [defendant] as a man is an affront to us all" and that the rules of the court prevented the prosecutor from saying "what he really is," since the prosecutor did not call defendant an "animal" or refer to him by another disparaging name, and these remarks were isolated.

**Am Jur 2d, Homicide § 463; Trial § 554.**

**19. Criminal Law § 458 (NCI4th Rev.)— capital sentencing— closing argument—defendant mean rather than mentally disturbed—no gross impropriety**

The prosecutor's closing argument in a capital sentencing proceeding to the effect that the evidence supported the conclu-

sion that defendant was "just plain mean" rather then under the influence of a mental or emotional disturbance fell within the wide latitude generally afforded counsel during closing argument and was not so grossly improper as to require *ex mero motu* intervention by the trial court.

**Am Jur 2d, Homicide § 463; Trial § 554.**

**20. Criminal Law § 1346 (NCI4th Rev.)— capital sentencing— same evidence for more than one circumstance—failure to give limiting instruction—no plain error**

In a capital first-degree murder sentencing proceeding wherein the trial court submitted the aggravating circumstances that the murder was committed while defendant was engaged in the commission of a first-degree rape and that the murder was especially heinous, atrocious, or cruel, any error in the trial court's failure to give the jury a limiting instruction informing it not to consider the rape when determining the existence of the especially heinous, atrocious, or cruel aggravating circumstance did not rise to the level of plain error where the evidence at trial established that defendant raped the seven-year-old victim while he smothered her with a pillow; the medical examiner testified that it would have taken ten to twenty minutes for the victim to die and that the victim would have been conscious for three to seven minutes during this period; and defendant raped and smothered the victim while her grandmother and three-year-old brother were in the same bedroom and while the brother watched.

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide § 554; Trial § 1760.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

**21. Criminal Law § 1066 (NCI4th Rev.)— capital sentencing— no right of allocution**

A defendant does not have a constitutional, statutory, or common law right to make unsworn statements of fact to the jury at the conclusion of a capital sentencing proceeding.

**Am Jur 2d, Criminal Law § 531; Homicide § 550.**

STATE v. PERKINS

[345 N.C. 254 (1997)]

Necessity and sufficiency of question to defendant as to whether he has anything to say why sentence should not be pronounced against him. 96 ALR2d 1292.

Resentencing because of error with respect to question to defendant as to whether he has anything to say why sentence should not be pronounced against him. 96 ALR2d 1337.

22. Criminal Law § 1402 (NCI4th Rev.)— death sentence not disproportionate

A sentence of death imposed upon defendant for first-degree murder was not excessive or disproportionate where defendant was found guilty on theories of felony murder and premeditation and deliberation; defendant had been dating the seven-year-old victim's grandmother for two months at the time of the killing; the victim and her three-year-old brother lived with their grandmother, slept in their grandmother's bedroom, and knew defendant; the murder occurred during the commission of a rape; and the jury found the especially heinous, atrocious, or cruel aggravating circumstance.

Am Jur 2d, Criminal Law § 628; Homicide § 556.

Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.

Sufficiency of evidence, for death penalty purposes, to establish statutory aggravating circumstance that murder was committed in course of committing, attempting, or fleeing from other offense, and the like—post-*Gregg* cases. 67 ALR4th 887.

Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed. 51 L. Ed. 2d 886.

Justice WEBB dissenting.

Justice FRYE joins in this dissent.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Sumner, J., at the 15 November 1993 Criminal Session of Superior Court, Pitt County,

STATE v. PERKINS

[345 N.C. 254 (1997)]

upon a verdict of guilty of first-degree murder. Defendant was also found guilty of first-degree rape and was sentenced to a consecutive term of life imprisonment. Defendant's motion to bypass the Court of Appeals as to the rape conviction was allowed 23 November 1994. Heard in the Supreme Court 21 June 1995.

*Michael F. Easley, Attorney General, by Charles M. Hensey, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Janine M. Crawley, Assistant Appellate Defender, for defendant-appellant.*

PARKER, Justice.

Defendant Sammy Crystal Perkins was tried capitally on indictments charging him with first-degree murder and first-degree rape. The jury found defendant guilty as charged. Following a capital sentencing proceeding, the jury recommended a sentence of death; and the trial court entered judgment accordingly. The trial court also imposed a consecutive sentence of life imprisonment for first-degree rape. For the reasons discussed herein, we conclude that the jury selection, guilt-innocence phase, and capital sentencing proceeding of defendant's trial were free from prejudicial error and that the death sentence is not disproportionate.

The State presented evidence tending to show that during the early morning hours on 19 April 1992, defendant sexually assaulted seven-year-old LaSheena Renae "JoJo" Moore and smothered her to death.

On 18 April 1992 defendant was living with his mother in Greenville. After visiting with his family and drinking several beers, defendant went to the home of Theia Esther Moore, a woman he had been dating for two months and had known for ten or eleven years. Moore lived in the house with her two children and four grandchildren, one of whom was the victim. Moore shared a room with two of her grandchildren, three-year-old Michael "Champ" Moore and the victim, who slept together on a daybed.

After leaving the Moore house for a short time, defendant returned and drank more beer and smoked crack cocaine. At approximately 3:00 a.m. on 19 April, defendant entered Moore's bedroom, where she and her two grandchildren were present. Defendant watched a pornographic video and then tried to have sex with Moore, who was surprised that he was in the room. Moore discovered a large

butcher knife under her pillow, and defendant explained that he had used it to open a can of beer.

Moore ordered defendant out of the house. As she walked him to the door, Champ rose from his bed and claimed that defendant had bitten his finger. After defendant left, he called Moore twice to insist that he had not bitten Champ. Moore then went to sleep; when she awoke at around 9:00 a.m., she observed that Champ's finger was swollen. At approximately 11:30 a.m., while the family was preparing to go to church for Easter services, Moore discovered that JoJo was dead.

The evidence tended to show that sometime early that morning, defendant had mounted the victim, held a pillow over her face, and had sex with her. The medical examiner determined that the victim died of suffocation and estimated that the victim's mouth and nose were covered for a period of between three to seven minutes before she became unconscious.

Defendant testified that on the night and morning in question, he had been drinking and smoking crack cocaine. He stated that JoJo awoke while he was having sex with Moore. He put a pillow over her face so that she would not see them. He said that he administered CPR, which he thought was successful in resuscitating her. He then went to the kitchen for a beer, used a knife to open the can, and placed the knife by Moore's bed. Sometime in the morning, he took Champ to the bathroom. Champ stuck his finger in defendant's mouth, and defendant bit it. He said Moore threw him out of the house after discovering the knife and the biting incident.

Defendant, who was in a wheelchair by the time of trial, explained that he suffers from a debilitative muscular disease called myasthenia gravis. His disability precluded him from having sexual intercourse in any position where he would have to support himself with his arms. On cross-examination defendant admitted that he had a prior conviction for attempted rape in 1981 and was released from prison in 1986. He also had prior convictions for possession with intent to sell and deliver heroin and cocaine in 1988 and 1989.

The jury found defendant guilty of first-degree rape and guilty of first-degree murder under the theories of premeditation and deliberation and felony murder. The jury found all three submitted aggravating circumstances: (i) that defendant had been previously convicted of a felony involving the use or threat of use of violence;

STATE v. PERKINS

[345 N.C. 254 (1997)]

(ii) that the murder was committed by defendant while defendant was engaged in the commission of or an attempt to commit first-degree rape; and (iii) that the murder was especially heinous, atrocious, or cruel. The jury also found one statutory and five non-statutory mitigating circumstances. The jury found that the mitigating circumstances did not outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty. The jury recommended the death penalty.

Additional facts will be presented as necessary to address specific issues.

## JURY SELECTION

[1] In his first assignment of error, defendant contends that the trial court erroneously excused a prospective juror for cause based on the juror's answers to the court's death-qualification questions. He argues that excusing the juror for cause violated the principles set out in *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776 (1968). He further contends that the trial court abused its discretion in failing to allow defendant to attempt to rehabilitate the juror. *See State v. Brogden*, 334 N.C. 39, 430 S.E.2d 905 (1993). We disagree with both contentions.

During death-qualification the trial court explained to prospective juror William E. Jackson the basic principles of the presumption of innocence and the burden of proof and outlined the capital sentencing procedure. Jackson stated that he understood the law as presented by the court. The following colloquy then occurred:

THE COURT: Please listen very carefully, Mr. Jackson, to the following questions. Consider your responses carefully before you respond. If you are selected to serve as a juror in this case, can and will you follow the law as it will be explained to you by the Court in deciding whether the defendant is guilty or not guilty of first-degree murder or of any other lesser offense?

JUROR: Yes, sir.

THE COURT: If you are satisfied beyond a reasonable doubt of those things necessary to constitute first-degree murder, can and will you vote to return a verdict of guilty of first-degree murder even though you know that death is one of the possible penalties?

JUROR: Yes, sir.

STATE v. PERKINS

[345 N.C. 254 (1997)]

THE COURT: Considering your personal beliefs . . . about the death penalty, please state for me whether you would be able or unable to vote for a recommendation of the death penalty even though you are satisfied beyond a reasonable doubt of the three things required by law concerning the aggravating and mitigating circumstances previously mentioned.

JUROR: I don't know whether I could vote on the death penalty.

THE COURT: Is that response an able or an unable response, sir?

JUROR: Unable to respond to that.

THE COURT: Unable. Thank you.

Mr. Staten—Jackson, excuse me. If the defendant is convicted of first-degree murder, can and will you follow the law of North Carolina as to the sentence recommendation to be made by the jury as the Court will explain it?

JUROR: Yes, sir.

The State challenged Jackson for cause. Defendant then requested that he be allowed to ask a few questions of Jackson, and the court denied his request. The court excused the juror for cause on the grounds that

as a matter of conscience regardless of the facts and circumstances . . . he would be unable to render a verdict with respect to the charge . . . and . . . that the juror's views concerning the death penalty would prevent or substantially impair the performance of his duties as a juror in accordance with the Court's instructions and the juror's oath.

Defendant first contends that Jackson was improperly excused because his responses to the questions asked did not support the conclusions of the court and did not render him unqualified to serve.

The standard for determining when a potential juror may be excluded for cause because of his views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)); *accord State v. Davis*,

325 N.C. 607, 621-22, 386 S.E.2d 418, 425 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990). Prospective jurors with reservations about capital punishment must be able to "state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149 (1986); *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 907-08 (1993). However, a prospective juror's bias or inability to follow the law does not have to be proven with unmistakable clarity. *State v. Locklear*, 331 N.C. [239,] 248, 415 S.E.2d [726,] 731-32 [(1992)]; *State v. Davis*, 325 N.C. at 624, 386 S.E.2d at 426. "[T]here will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror." *Wainwright v. Witt*, 469 U.S. at 426, 83 L. Ed. 2d at 852-53.

*State v. Conaway*, 339 N.C. 487, 511-12, 453 S.E.2d 824, 839-40, *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 153 (1995).

Jackson told the court that he could follow the law as explained to him by the court with respect to the sentencing procedure. However, he also stated that he did not know whether he "could vote on the death penalty" and that he was "[u]nable to respond" to a question asking whether he would be able or unable to recommend a death sentence if the State proved its case beyond a reasonable doubt. Under *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492 (1992), general "follow the law" questions are not sufficient to "detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath." *Id.* at 734-35, 119 L. Ed. 2d at 506. The judge heard Jackson's tone of voice and observed his demeanor. Jackson's inability to respond to a dispositive question was sufficient to permit the court to conclude that Jackson's views with respect to the death penalty would prevent or substantially impair the performance of his duties as a juror. Accordingly, the trial court did not err in excusing him for cause.

Defendant also contends that the trial court committed reversible error by not permitting him to question Jackson further. "Both the defendant and the State have the right to question prospective jurors about their views on capital punishment." *Brogden*, 334 N.C. at 43, 430 S.E.2d at 908. "The manner and extent of inquiry on *voir dire* is within the trial court's discretion." *State v. Taylor*, 332 N.C. 372, 390,

420 S.E.2d 414, 425 (1992). When the challenge for cause is support-
ed by the prospective juror's answers to questions propounded on
*voir dire,* the defendant must show that further questioning "would
likely have produced different answers" to establish that the trial
court abused its discretion by refusing to allow the defendant to reha-
bilitate the challenged juror. *State v. Oliver,* 302 N.C. 28, 40, 274
S.E.2d 183, 191 (1981); *accord Brogden,* 334 N.C. at 44, 430 S.E.2d at
908.

In *Brogden* we held that the trial court committed reversible
error by failing to exercise its discretion in deciding whether to allow
the defendant to rehabilitate a prospective juror. The trial court in
that case ruled that it would not allow rehabilitation of prospective
jurors, informing counsel that "the Supreme Court of North Carolina
stated that such is a waste of valuable time." *Brogden,* 334 N.C. at 40,
430 S.E.2d at 906. In determining that the court committed reversible
error, we noted that prospective juror Hall had consistently indicated
that he would listen to the evidence and make his decision based on
it, not on some predisposition to vote one way or the other. Hall told
the court that he would vote for death if the State proved its case and
that he was not "totally" either for or against the death penalty.
Further, Hall stated that he believed that he could vote for the death
penalty in the appropriate case. Hall, like the prospective juror in the
present case, also gave conflicting responses which justified the exer-
cise of a challenge for cause. When asked whether "[his] feelings
about the death penalty would prevent or substantially impair the
performance of [his] duty as a juror," Hall responded that his feelings
would "partially" and "to some extent prevent or substantially
impair" the performance of his duties as a juror. *Id.* at 52, 430 S.E.2d
at 913. Hall also expressed uncertainty about whether he could be
qualified under the law. The defendant argued, and we agreed, that
"Hall would likely have answered the dispositive questions differ-
ently if the court had acceded to defendant's request to attempt to
rehabilitate him." *Id.* at 52, 430 S.E.2d at 912. We determined that it
was likely that Hall was confused about the meaning of the phrase
"prevent or substantially impair" and that, except for the responses
which supported excusing Hall for cause, Hall's entire *voir dire* sug-
gested that he was a qualified juror. *Id.*

After considering prospective juror Jackson's *voir dire* in its
entirety, we conclude that there is very little to suggest that he was
qualified other than his response that he would follow North Carolina
law with respect to the sentencing procedure. Jackson stated

STATE v. PERKINS

[345 N.C. 254 (1997)]

unequivocally that he did not know whether he "could vote on the death penalty" and that he was "[u]nable to respond" to a question asking whether he could recommend the death penalty if the State proved its case. Since Jackson did not know his position on the issue, we cannot conclude that he would likely have answered the dispositive questions differently if the court had allowed defendant to ask him additional questions. Accordingly, we conclude that the trial court did not abuse its discretion by declining defendant's request to question Jackson further. This assignment of error is overruled.

[2] Defendant next assigns error to the removal of three additional prospective jurors on the ground that their excusal violated the *Witherspoon* rule. These prospective jurors unambiguously stated that they would not recommend a sentence of death even if the State proved its case beyond a reasonable doubt. Accordingly, the trial court did not err by excusing them for cause. *See State v. Ward*, 338 N.C. 64, 87-88, 449 S.E.2d 709, 721-22 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 1013 (1995).

Defendant also contends that the trial court erred by refusing to allow defendant to rehabilitate the prospective jurors. In response to questions propounded by the trial court, the prospective jurors at issue were unequivocal about their inability to vote for the death penalty. Additional questioning by defendant would not likely have produced different responses. Accordingly, we hold that the trial court did not abuse its discretion by refusing to allow defendant to question these jurors further. *See id.*

[3] Under this assignment of error, defendant also argues that the trial court violated various federal and state constitutional provisions by excluding the prospective jurors who could not be death-qualified. He contends that the excusal of these prospective jurors denied defendant the right to a jury selected from a fair cross-section of the community, in violation of the Sixth Amendment to the United States Constitution and Article I, Sections 19, 23, and 24 of the North Carolina Constitution. He also contends that the excusal of these jurors violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Sections 19, 23, and 26 of the North Carolina Constitution. Defendant notes that only five percent of white veniremen were excused for their opposition to the death penalty, while thirty-five percent of black veniremen were so excused. He argues the jury selected was far less representative of the community than the venire originally called.

The excusal of a prospective juror does not violate the Equal Protection Clause solely because of its impact on the racial composition of the jury. *See Hernandez v. New York*, 500 U.S. 352, 359-60, 114 L. Ed. 2d 395, 406 (1991). " 'Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.' " *Id.* at 360, 114 L. Ed. 2d at 406 (quoting *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265, 50 L. Ed. 2d 450, 464 (1977)). The Sixth Amendment does not guarantee a "defendant the right to a jury composed of members of a certain race or gender." *State v. Norwood*, 344 N.C. 511, 527, 476 S.E.2d 349, 355 (1996), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 65 U.S.L.W. 3665 (1997). In the present case the trial court properly excluded the prospective jurors at issue. The record discloses that the prosecutor asked the court to excuse these jurors on the basis of their inability to recommend a death verdict if the State proved its case. Defendant has not proved that any prospective juror was excluded on the basis of his or her race. Merely showing disproportionate impact on the racial composition of the jury is not sufficient to establish a violation of defendant's federal or state constitutional rights. This assignment of error is overruled.

Defendant next assigns error to the court's failure to excuse for cause two jurors, Michael Parker and Charles Ayers, who defendant contends indicated an inability to render a fair decision.

[4] As to Parker, defendant first argues that Parker should have been removed for cause pursuant to *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492. While Parker was being questioned during individual *voir dire* about pretrial publicity, defendant's attorney asked him if he had formed any opinion concerning the punishment defendant should receive if he were convicted. Parker stated that he had formed such an opinion and that, if defendant were convicted, he would "more than likely" vote for death. The court reminded counsel that the individual *voir dire* was limited to pretrial publicity and did not allow further questions regarding the death penalty at that time.

Later during the jury *voir dire*, Parker told the court that he would follow the law in making his decision and that he would not automatically vote for the death penalty regardless of the evidence in mitigation. The court offered to allow defendant to ask further questions. Defendant declined to do so and exercised a peremptory challenge to remove Parker.

Defendant argues that Parker's assertion that he would "more than likely" recommend the death penalty required the trial court to

STATE v. PERKINS

[345 N.C. 254 (1997)]

exclude him for cause pursuant to *Morgan*. We disagree. Later in the jury *voir dire*, after the jury's duties had been more fully explained, Parker said that if defendant were convicted of first-degree murder, he would not automatically vote for the death penalty regardless of the evidence. Parker also told the court that he would follow the law of North Carolina as the court would explain it as to the sentence recommendation to be made by the jury. These answers were sufficient for the court to conclude that defendant had not established that Parker's views would prevent or substantially impair the performance of his duties as a juror. Further, we note that defendant did not challenge Parker for cause based on *Morgan* and has, therefore, not preserved this argument for review.

[5] Defendant also argues that the trial court erred by not allowing the challenge for cause to Parker on the basis that his *voir dire* showed he would be unable to properly apply the law on the presumption of innocence. During the jury *voir dire*, the following colloquy occurred:

> [DEFENSE COUNSEL]: Do you [Mr. Parker] have an understanding in a general way of what is meant when I say that the defendant is presumed to be innocent?
>
> JUROR: (Nods head), yes, sir.
>
> [DEFENSE COUNSEL]: Um, do you have some idea in a general way of what I mean when I say that when a crime is charged the State has to prove sometimes . . . five or six elements?
>
> JUROR: (Nods head).
>
> . . . .
>
> [DEFENSE COUNSEL]: Um, if the Judge instructed you that the State had to prove four elements or facts beyond a reasonable doubt to prove a charge and the State proved three, would you have any hesitation about returning a verdict of not guilty?
>
> JUROR: Depending on the facts, I would try to go by that, but, I mean, depending on the facts I may be hesitant. I mean, I don't know about the case. But I would try.
>
> [DEFENSE COUNSEL]: You would try what?
>
> JUROR: To make all four elements be proved before I said he was guilty.

STATE v. PERKINS

[345 N.C. 254 (1997)]

[DEFENSE COUNSEL]: Would—would that—are you saying—I mean, I don't want to put words in your mouth, but you seem to have some hesitancy in that regard?

JUROR: Well, as I said, it depends on the facts. If three heavily outweighed one, I may be hesitant. I'm sure I would try to go according to the law.

THE COURT: Mr. Parker, was your last response that you would try to follow the law; is that what you said?

JUROR: Uh-huh.

After a bench conference, defense counsel challenged Parker for cause. The court then asked Parker the following questions:

THE COURT: All right. Mr. Parker, I—you haven't done anything wrong. I just want to ask you a couple of questions myself.

JUROR: Okay.

[THE COURT]: Are you able to sit in that seat, sir, if you are chosen as a juror, would you be able to listen to the evidence in this case, sir, listen to arguments of counsel at the conclusion of the evidence and listen to the law that I give you in reaching a verdict, and would you be able to reach a fair and impartial verdict, sir?

JUROR: Yes, sir.

[THE COURT]: Would you be able to follow the law as I explain it to you, sir?

JUROR: Yes, sir.

[THE COURT]: All right. Thank you.

Challenge is denied.

Defendant, relying on *State v. Cunningham*, 333 N.C. 744, 429 S.E.2d 718 (1993), and *State v. Hightower*, 331 N.C. 636, 417 S.E.2d 237 (1992), argues that this colloquy shows that Parker was willing to forego holding the State to its burden of proof on certain elements if he thought a majority of the elements had been proven to his satisfaction. In *Cunningham* after several explanations of the law pertaining to presumption of innocence, the prospective juror continued to equivocate about defendant proving his innocence. We concluded

that the jury *voir dire* demonstrated that the challenged venire person was confused or had a fundamental misunderstanding of the presumption of innocence or was simply reluctant to apply those principles if the defense did not present evidence of defendant's innocence. In that case, for whichever reason, the juror's answers amply supported a conclusion that she would not be able to render a verdict in accordance with the law of North Carolina. In *Hightower* the prospective juror said that he would try to follow the law but that the defendant's failure to testify might "stick in the back of [his] mind." 331 N.C. at 639, 417 S.E.2d at 239. In this case Parker stated unequivocally that he would follow the law as explained to him by the court. This answer was given during the colloquy in regard to finding defendant guilty even if all the elements of the crime are not proved. Moreover, later on *voir dire*, Parker stated unequivocally that even if he thought defendant might be guilty but was not satisfied beyond a reasonable doubt, he would not hesitate to find defendant not guilty. Unlike in *Cunningham* and *Hightower*, Parker's answers do not demonstrate that he could not return a verdict in accordance with the law of North Carolina or would not be a fair and impartial juror. N.C.G.S. § 15A-1212(8) and (9) (1988). We conclude the trial court did not err in denying the challenge for cause to Parker.

[6] Defendant also contends under this assignment of error that the trial court erred by refusing to allow his challenge for cause to prospective juror Charles Ayers. Ayers stated on jury *voir dire* that he had known a young girl who was murdered and that he had strong feelings about it which he would likely take into the jury room. The court asked Ayers whether his strong feelings would prevent him from being a fair and impartial juror, and he said they would not. We conclude that the trial court did not err by denying the challenge for cause to Ayers. This assignment of error is overruled.

[7] In his next assignment of error, defendant contends that pretrial publicity surrounding the homicide was so extensive as to require a change of venue or a special venire from another county. He argues that this publicity made it impossible for him to receive a fair trial by a Pitt County jury.

"N.C.G.S. § 15A-957 provides that if there is so great a prejudice against a defendant in the county in which he is charged that he cannot receive a fair trial, the court must transfer the case to another county or order a special venire from another county." *State v. Best*, 342 N.C. 502, 510, 467 S.E.2d 45, 50, *cert. denied*, —— U.S. ——, 136

L. Ed. 2d 139 (1996). Under this statute the burden is on the moving party to show that " 'it is reasonably likely that prospective jurors would base their decision in the case upon pretrial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they might have formed.' " *State v. Gardner,* 311 N.C. 489, 497, 319 S.E.2d 591, 597-98 (1984) (quoting *State v. Jerrett,* 309 N.C. 239, 255, 307 S.E.2d 339, 347 (1983)), *cert. denied,* 469 U.S. 1230, 84 L. Ed. 2d 369 (1985). Relevant to this determination is testimony by prospective jurors that they can decide the case based on the evidence presented and not on pretrial publicity or any other evidence received outside the courtroom. *State v. Hunt,* 323 N.C. 407, 373 S.E.2d 400 (1988), *sentence vacated on other grounds,* 494 U.S. 1022, 108 L. Ed. 2d 602 (1990).

Our review of the record in this case reveals the trial court did not err in denying the motion for a change of venue. After questioning, ten jurors who indicated they had formed an opinion based on pretrial publicity were excused. Several of the jurors selected to serve had not heard of the case. Those jurors selected who had seen something about the case on television, read about it in the newspapers, or heard about it by word of mouth had not formed an opinion about the case and said they could set aside any such information. The record discloses that no juror who sat on the case was biased against defendant or in favor of the prosecution by reason of what was reported by newspapers or television. This assignment of error is overruled.

## GUILT-INNOCENCE PHASE

[8] Defendant next assigns error to the court's denial of his motion for a mistrial or, in the alternative, for the removal of a juror for misconduct. During the trial, Nancy Letchworth, a deputy clerk of superior court, told the presiding judge that she had been told by Tammy Beachum, another deputy clerk of court, that Beachum and Alecia Staton, a juror in this case, had the same baby-sitter. When Beachum picked up her child, the baby-sitter, Wendy Clark, told Beachum that juror Staton had told Clark that the jury had decided defendant was guilty and, except for one holdout, felt defendant should be put to death.

The court held a hearing out of the presence of the jury. Clark testified that juror Staton had told her the jurors believed defendant was guilty and, except for one juror, believed he should be put to death. Beachum testified that this information is what Clark had told her,

and Letchworth corroborated the testimony of Beachum. Each of the jurors was questioned separately; and each of them, including Staton, denied having formed an opinion as to the guilt of defendant. Juror Staton denied telling Clark that the jurors believed defendant was guilty or that they favored a death sentence.

The superior court found as facts (i) that Staton did have a conversation with her baby-sitter, (ii) that the court could not determine the content of the conversation, (iii) that all fourteen jurors denied having formed an opinion as to the guilt or innocence of defendant, and (iv) that the jurors denied having formed an opinion on punishment. The court refused to declare a mistrial or to excuse juror Staton.

The decision to grant a mistrial on the ground of juror misconduct rests largely within the discretion of the trial court. The court's decision will not be disturbed unless there is a clear showing that the court abused its discretion. *State v. Bonney*, 329 N.C. 61, 405 S.E.2d 145 (1991).

Upon inquiry by the trial court, Clark stated that juror Staton never indicated when or where the communication among the jurors occurred. Clark stated that the holdout juror was never identified. Furthermore, the evidence was unclear regarding when the conversation between juror Staton and Clark took place and what, if anything, was said about the case. Juror Staton testified that she had not even been to Clark's home the day the alleged conversation took place; instead, her husband dropped off and picked up their child on that day. Even more significant is that upon extensive examination by the court, juror Staton and each of the other jurors denied having formed or expressed any opinion regarding the guilt of defendant or the sentence to be imposed if he were found guilty. The court made findings of fact consistent with the evidence and concluded that there had been no juror misconduct. Moreover, if the incident happened as described by Clark, no outside influence was exerted on the jury. We hold that the court did not abuse its discretion by refusing to declare a mistrial or to excuse juror Staton. This assignment of error is overruled.

[9] Next, defendant assigns error to the trial court's failure to allow into evidence a videotaped interview of three-year-old Michael "Champ" Moore conducted by child psychologist Dr. Raymond Webster. Defendant argues that the videotape was properly authenticated and that it should have been admitted to impeach the hearsay

testimony of a statement by Champ Moore, who was present in the room when his sister died.

Juvenile Investigator Connie Elks testified at trial about statements Champ made to her on 19 April 1992, prior to the videotaped interview with Dr. Webster. She testified that Champ told her defendant had bitten his finger, watched a "nasty" videotape, and "made [the victim] dead." He mentioned the pillow, but would not respond to further questioning. These statements were admitted under the spontaneous utterance exception to the hearsay rule. *See* N.C.G.S. § 8C-1, Rule 803(2) (1992).

Defendant attempted to introduce the videotape of an interview that took place between Champ and Dr. Webster approximately ten days after the killing. Defendant argues this videotape would have impeached Elks' testimony and that Detective Ricky Best properly authenticated the tape by identifying the two participants and by keeping the tape in his continuous custody since its making. *See State v. Stager*, 329 N.C. 278, 406 S.E.2d 876 (1991).

Even assuming *arguendo* that the videotape was properly authenticated and should have been admitted, defendant has failed to show that a reasonable possibility exists that the result would have been different but for the trial court's failure to admit the tape. We have carefully reviewed the videotape. While Champ Moore had some difficulty expressing himself and answering questions, he did state that defendant put a "pillow on [the victim's] head" and "her died." These comments and others were consistent with Elks' testimony. Moreover, defendant admitted placing a pillow on the victim's face; and the physical evidence suggested the victim had been smothered and raped. The victim's cousin, Stem Moore, testified that he saw defendant on top of the victim, that a pillow was on the victim's face, and that defendant was having sex with her. This assignment of error is overruled.

[10] In a related assignment of error, defendant contends that the trial court erred by admitting under the excited utterance exception to the hearsay rule the testimony of Elks as to what Champ told her. Defendant argues that Champ did not witness the death of his sister and that there was ample time for him to have acquired secondhand information about his sister's death prior to making his alleged statements. Defendant argues that the admission of this testimony violated his Confrontation Clause rights and prejudiced him at

the guilt-innocence phase and in the sentencing proceeding of his trial.

Elks testified that on 19 April 1992 at approximately 1:00 p.m., Champ Moore told her that "Sea Dog," defendant, had bitten him while he was on the bed with "Doe-Doe," his sister. Champ said that defendant had made him watch a "nasty" tape. He also stated that "[m]ommy woke up and Doe-Doe was dead" and that "Sea Dog made her dead." The trial court admitted these statements under the excited utterance exception to the hearsay rule. N.C.G.S. § 8C-1, Rule 803(2). The scope of this exception has been expanded where children are the hearsay declarants. *See State v. Reeves*, 337 N.C. 700, 448 S.E.2d 802 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 860 (1995); *State v. Smith*, 315 N.C. 76, 337 S.E.2d 833 (1985). In this case the child made his statements approximately ten hours after the murder and one hour after the body had been discovered. He had been through a startling experience—witnessing his sister's death—that suspended reflective thought. Furthermore, his statements were spontaneous; nothing in the record supports defendant's contention that the statements were fabricated or the result of secondhand information. *See Smith*, 315 N.C. at 86-90, 337 S.E.2d at 841-43. To the contrary, Champ's Uncle Hotrod testified that Champ came into his room about 10:00 a.m. on 19 April and mentioned defendant had done something to the victim. Hotrod had difficulty understanding Champ and ignored him. This assignment of error is overruled.

[11] Defendant next assigns error with respect to the following portion of the prosecutor's closing argument:

> As I say, you'll be able to consider both types of murder in the first degree and I say to you that in this case that it's important that you look at both and you can return a verdict of guilty under both theories of murder in the first degree. And the impact of your consider—-should you find the defendant guilty of murder in the first degree under both theories, that gives the judge a greater option with regard to punishment. So again I say to you that it's important to consider both.

Defendant contends that by making this argument the prosecutor improperly urged the jury to convict defendant of both theories of first-degree murder based on the potential for greater punishment rather than the evidence presented at trial. *See State v. Martin*, 322 N.C. 229, 367 S.E.2d 618 (1988). Defendant argues that the trial court

erred by not giving a curative instruction to the jury and by denying defendant's motion for a mistrial.

We note at the outset that defendant did not object to the argument when it was made and did not make his motion for a mistrial until after the jury had retired. Where a defendant does not object at trial to an allegedly improper jury argument, the trial court need not intervene *ex mero motu* unless the argument is "so grossly improper as to be a denial of due process." *State v. Zuniga*, 320 N.C. 233, 257, 357 S.E.2d 898, 914, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987). A prosecuting attorney is allowed wide latitude in arguing to the jury. *Martin*, 322 N.C. at 240, 367 S.E.2d at 624. Furthermore, the decision whether to grant a mistrial lies within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *State v. Johnson*, 295 N.C. 227, 244 S.E.2d 391 (1978).

Assuming *arguendo* that this argument was improper, we must decide whether the trial court's failure to intervene denied defendant a fair trial. "It is largely in the discretion of the trial court to decide when and how it will correct the potential effects of an improper argument by counsel, either by stopping the argument or by proper instructions to the jury." *State v. Scott*, 314 N.C. 309, 314, 333 S.E.2d 296, 299 (1985).

The trial court correctly instructed the jury on the legal standard it was to apply in determining guilt and on the effect of the State's failure to carry its burden of proving guilt beyond a reasonable doubt. We are not persuaded that the jury rendered a guilty verdict under both theories of first-degree murder based on the prosecutor's argument rather than on the overwhelming evidence of defendant's guilt. We conclude that any impropriety in the prosecutor's argument or error in the trial judge's failure to intervene was cured by the subsequent instructions on the law. The argument in this case was not so improper as to require the judge to intervene *ex mero motu* or to declare a mistrial. This assignment of error is overruled.

[12] In his next assignment of error, defendant contends that the trial court erred by allowing certain questions propounded on cross-examination to one of defendant's witnesses. Dr. Billy Royal, a forensic psychologist, testified that defendant's capacity to distinguish right from wrong and to premeditate his actions was diminished at the time of the killing.

On cross-examination the following colloquy occurred between Dr. Royal and the prosecutor:

Q: I believe you testified and said you worked for awhile in the forensic unit at Dorothea Dix hospital; is that right, sir?

A: I did.

Q: And you were fired from that unit, weren't you, sir?

A: No.

Q: You were removed from that unit?

A: I transferred from that unit.

. . . .

Q: For misconduct; isn't that true, sir?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A: No, that's not true.

. . . .

A: Over a period of time, ah, [Dorothea Dix psychiatrist] Doctor Rollins and I had some, ah, disagreement, um, because he felt that I kept patients too long . . . .

Um, after some five or six years, um, of that, ah, there had been some, um, discussion about that, and on one occasion one patient made a complaint, ah, ah, to the administration related to my contact with the patient . . . .

And, ah, I discussed that with the hospital administrator and decided in terms of my continuing conflict with Doctor Rollins to transfer to another division which I did. . . .

. . . .

Q: And . . . with regard to leaving the forensic unit at Dorothea Dix you said some patient made a complaint that caused you to then leave; that related to you making some—allegations that you had made improper advances to a patient; isn't that true, sir?

[DEFENSE COUNSEL]: Objection.

A: No.

THE COURT: Overruled. You may answer.

A: (Shakes head).

Q:  What was the nature of it then, sir?

A:  The patient made a complaint. I have never been familiar with the total complaint.

Q:  You are not familiar with the complaint?

A:  No.

Specific instances of misconduct of a witness may, in the discretion of the trial court, be inquired into on cross-examination if probative of truthfulness or untruthfulness. N.C.G.S. § 8C-1, Rule 608(b) (1992). Even if we assume *arguendo* that the trial court erred by permitting the prosecutor to inquire into the allegation that Royal had made improper advances to a patient, defendant must still show prejudice. "A witness may be cross-examined on any matter relevant to any issue in the case, including credibility." N.C.G.S. § 8C-1, Rule 611(b) (1992); *accord State v. Lee*, 335 N.C. 244, 271, 439 S.E.2d 547, 560, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994); *see* 1 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 154 (4th ed. 1993). A witness may be impeached by showing that he or she is biased. *State v. McKeithan*, 293 N.C. 722, 730, 239 S.E.2d 254, 259 (1977). The questions asking whether Royal had been fired, removed, or transferred for misconduct were relevant to show that Royal may have been biased against the State. Royal testified that he had not been fired, removed, or transferred for misconduct. He denied making any improper advances to a patient. In light of the overwhelming evidence against defendant and Royal's express denial of any misconduct, we conclude that defendant cannot show that, had the trial court excluded the prosecutor's inquiry into the details of the allegation, a reasonable possibility exists that a different outcome would have resulted at trial. *See* N.C.G.S. § 15A-1443(a) (1992). This assignment of error is overruled.

## SENTENCING PROCEEDING

[13] Defendant next contends that the trial court erred by allowing the prosecutor to elicit irrelevant and highly prejudicial information during his cross-examination of defense witness Sudie Davis. In the course of the direct testimony of Sudie Davis for defendant, Davis read from letters defendant had written to her while he was in jail. Defendant wrote in the letters that he was a "pretty good person," thought "about the Lord daily," and knew he should give his life to the Lord. The prosecutor asked Davis on cross-examination whether she had accused defendant of raping her daughter in 1978. The court

overruled an objection to this question. Defendant argues that this question should not have been allowed on the bases that (i) it was irrelevant and inadmissible evidence of bad character; (ii) it concerned an unsubstantiated accusation of crime; and (iii) its probative value was outweighed by the danger of unfair prejudice under N.C.G.S. § 8C-1, Rule 403.

"Where a defendant in a capital sentencing proceeding has placed his character at issue by having witnesses testify favorably with regard to it, the State may offer evidence to rebut this testimony." *State v. Williams*, 339 N.C. 1, 49, 452 S.E.2d 245, 273-74 (1994), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 61 (1995). Davis read from letters in which defendant stated that he was a "pretty good person," that he thought "about the Lord daily," and that he knew he should give his life to the Lord. This evidence tended to enhance defendant's reputation and show good character. Accordingly, we conclude that the prosecutor was entitled to elicit information from Davis to rebut it. This assignment of error is overruled.

[14] In his next assignment of error, defendant contends that the trial court erred by allowing the prosecutor to cross-examine defendant about the length of time he served for a prior conviction. On cross-examination the prosecutor elicited testimony that in 1981 defendant had been sentenced to fifteen years in prison for attempted first-degree rape. The prosecutor asked defendant how long he served; and, after the court overruled defendant's objection, defendant stated that he had been released in 1986 or 1987. Defendant also stated that he had been sentenced to ten years in prison for drug convictions in 1988 and to two ten-year sentences and a consecutive five-year sentence for drug-related charges in 1989.

Defendant contends that the prosecutor's cross-examination with respect to the length of the time he actually served for attempted rape exceeded the proper limits of impeachment by evidence of a prior conviction and improperly injected the issue of parole eligibility into the sentencing proceeding. Defendant also argues that the admission of this evidence entitled him to an instruction on parole eligibility.

"The permissible scope of inquiry into prior convictions for impeachment purposes is restricted . . . to the name of the crime, the time and place of the conviction, and the punishment imposed." *State v. Lynch*, 334 N.C. 402, 409, 432 S.E.2d 349, 352 (1993); *see* N.C.G.S. § 8C-1, Rule 609(a) (1992). However, the Rules of Evidence do not apply at capital sentencing proceedings. Any evidence that the

trial court deems relevant to sentencing may be introduced in the sentencing proceeding. N.C.G.S. § 15A-2000(a)(3) (1988) (amended 1994); *State v. Daughtry*, 340 N.C. 488, 517, 459 S.E.2d 747, 762 (1995), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 739 (1996). Evidence showing that defendant had been previously convicted of attempted first-degree rape was admissible to establish the aggravating circumstance that "[t]he defendant had been previously convicted of a felony involving the use or threat of violence to the person." N.C.G.S. § 15A-2000(e)(3); *see State v. Holden*, 338 N.C. 394, 450 S.E.2d 878 (1994). Even if we assume *arguendo* that evidence of the length of time served by a defendant pursuant to a prior conviction is not relevant at a capital sentencing proceeding, we conclude that defendant cannot show any prejudicial error in the admission of such evidence. The court properly admitted evidence of the prior conviction. This evidence showed that defendant had been sentenced to a term of fifteen years' imprisonment for attempted rape in 1981. Defendant killed the victim in this case in 1992. These facts demonstrate that defendant obviously did not serve his entire fifteen-year sentence. The State presented substantial evidence establishing defendant's guilt and supporting each of the aggravating circumstances. In light of these circumstances, defendant cannot show that a reasonable possibility exists that a different result would have been reached at trial had the trial court precluded the challenged inquiry. *See* N.C.G.S. § 15A-1443(a).

**[15]** Defendant also contends that the prosecutor's inquiry highlighted the gap between defendant's sentence and the amount of time served, thereby raising the possibility that defendant might be paroled if sentenced to a term of life imprisonment. He argues that the court erred by permitting the prosecutor's inquiry and that this inquiry entitled him to an instruction on parole eligibility. We have repeatedly held that, as to crimes committed prior to 1 October 1994, evidence with respect to parole eligibility is not relevant in a capital sentencing proceeding. *State v. Green*, 336 N.C. 142, 443 S.E.2d 14, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). After careful review of the record, we conclude that the prosecutor's inquiry did not raise the issue of defendant's eligibility for parole in the event the jury recommended a sentence of life imprisonment. Accordingly, defendant was not entitled to an instruction on parole eligibility. This assignment of error is overruled.

In his next assignment of error, defendant contends that the trial court erred by overruling defendant's objections to various argu-

ments made by the prosecutor during his sentencing proceeding closing argument and by failing to intervene *ex mero motu* with an additional argument.

> As a general proposition, counsel is allowed wide latitude in the jury argument during the capital sentencing proceeding. *State v. Soyars*, 332 N.C. 47, 418 S.E.2d 480 (1992). Counsel is permitted to argue the facts which have been presented, as well as reasonable inferences which can be drawn therefrom. *State v. Williams*, 317 N.C. 474, 346 S.E.2d 405 (1986). In order for a defendant to receive a new sentencing proceeding, the prosecutor's comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157 (1986).

*State v. McCollum*, 334 N.C. 208, 223-24, 433 S.E.2d 144, 152 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

**[16]** Defendant argues that the following argument improperly put the jurors in the place of the victim:

> Put yourselves back on that 19th day of April of 1992, in that back bedroom, a little old red night light on, and Jo-Jo in a little daybed with her three year old brother, in the middle of the night. Just put yourself in her shoes—

> [DEFENSE COUNSEL]: Objection, Your Honor.

> THE COURT: Overruled.

> ([The prosecutor] continues)

> —for just a minute. Put yourselves, for just a minute, put yourselves where she was. And you're in that little daybed in the middle of the night and for some reason you wake up and you sit up in bed. Something had startled you or something and you had sat up and there is [defendant] and he pushes you down on the bed, covers your little face with a pillow, starts to suffocate you, smother you, and rape you. And you're twisting and turning and gasping for breath, and he continues and he continues and he continues. And not only are you gasping for breath, your legs are spread apart and he's pushing his penis into you. A seven year old child. And it goes on and it goes on and it goes on until you're unconscious.

"An argument 'asking the jurors to put themselves in place of the victims will not be condoned . . . .' " *Id.* at 224, 433 S.E.2d at 152 (quoting *United States v. Pichnarcik*, 427 F.2d 1290, 1292 (9th Cir. 1970)). The portion of the prosecutor's argument asking the jurors to put themselves in the position of the victim was improper. Accordingly, we must decide whether this portion of the prosecutor's closing argument denied defendant due process. *Id.*

In *McCollum* we concluded that the defendant's due process rights had not been violated where (i) the prosecutor's arguments did not manipulate or misstate the evidence, (ii) the prosecutor's arguments did not implicate the defendant's right to counsel or right to remain silent, (iii) the trial court instructed the jury to make its decision on the basis of the evidence alone and that the arguments of counsel were not evidence, and (iv) the weight of the evidence supporting the aggravating circumstances was heavy. *Id.* In the present case the prosecutor's argument did not manipulate or misstate the evidence. The argument did not implicate any specific rights of the accused, such as the right to counsel or the right to remain silent. The State's evidence was overwhelming that defendant raped and smothered the victim, and the evidence strongly supported each of the aggravating circumstances found by the jury. On this record we conclude that it is not likely that the jury's decision was influenced by the portion of the prosecutor's argument asking the jurors to put themselves in the position of the victim. Therefore, the prosecutor's argument did not deny defendant due process.

**[17]** Defendant next argues, citing *Williams*, 317 N.C. 474, 346 S.E.2d 405, that the court erred by overruling his objection to a portion of the prosecutor's argument suggesting that defendant killed the victim to prevent her from testifying against him. Defendant argues that there was no evidence to support this argument. Even if we assume *arguendo* that this portion of the prosecutor's argument was improper, we conclude that it did not violate his right to due process. In light of the overwhelming evidence showing defendant's guilt and supporting the imposition of the death penalty, it is unlikely that this portion of the prosecutor's argument influenced the jury's sentencing recommendation.

**[18]** Defendant next argues that the trial court erred by overruling his objections to the following argument:

> He's just sorry. I'm going to tell you just like it is. Just basic right down tell you, the man is sorry. The word—to describe him as a man is an affront to all of us.

[DEFENSE COUNSEL]: Objection, improper argument.

THE COURT: Overruled.

([The prosecutor] continues)

I wish I could say what he really is, but the rules of this court prevent me from saying it.

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Overruled.

([The prosecutor] continues)

But you know in your heart of hearts, you know how sorry he is. . . .

We have stated "that we do not sanction comparisons of criminal defendants to members of the animal kingdom." *State v. Richardson*, 342 N.C. 772, 793, 467 S.E.2d 685, 697, *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 160 (1996); *accord State v. Hamlet*, 312 N.C. 162, 173, 321 S.E.2d 837, 845 (1984). By making the argument at issue, the prosecutor did not call defendant an "animal" or refer to him by any other disparaging term. The remarks at issue were isolated, and we conclude that the trial court did not err by overruling defendant's objection to them.

**[19]** Defendant next argues that the trial court erred by failing to intervene *ex mero motu* in the following argument:

"A capital felony was committed while the defendant was under the influence of mental or emotional disturbance." Well, you know, they used to call that just plain mean. He's just plain mean. They can't even find the category to put it in, so they call it an emotional or mental disturbance.

Defendant did not object to this argument at trial. Therefore, this argument is reviewable only to determine whether it was so grossly improper that the trial court erred by failing to intervene *ex mero motu* to correct any error. *State v. Gregory*, 340 N.C. 365, 424, 459 S.E.2d 638, 672 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 478 (1996). In context it is apparent that the prosecutor was not attempting, as defendant argues, to define the mental or emotional disturbance mitigating circumstance. Rather, the prosecutor was arguing that the evidence supported the conclusion that defendant was mean rather than mentally disturbed. We conclude that this argument falls

within the wide latitude generally afforded counsel during closing argument and that it was not so grossly improper as to require *ex mero motu* intervention by the trial court. This assignment of error is overruled.

[20] Next, defendant argues that the trial court committed plain error by failing to give the jury a limiting instruction informing it not to consider the rape when determining whether the especially heinous, atrocious, or cruel aggravating circumstance existed. The trial court submitted to the jury the aggravating circumstances that the murder was committed while defendant was engaged in the commission of or an attempt to commit first-degree rape, N.C.G.S. § 15A-2000(e)(5), and that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). Defendant concedes that the evidence was sufficient to permit the jury to find the existence of both circumstances. He argues only that the trial court erred by permitting the jury to consider evidence showing that defendant raped the victim as support for both circumstances. Defendant did not object to the instruction given by the court or request a limiting instruction. Accordingly, our review is limited to determining whether the court's instructions constituted plain error.

"In order to rise to the level of plain error, the error in the trial court's instructions must be so fundamental that (i) absent the error, the jury would have reached a different verdict; or (ii) the error would constitute a miscarriage of justice if not corrected." *State v. White*, 340 N.C. 264, 299, 457 S.E.2d 841, 862, *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 436 (1995); *accord State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993). We have previously concluded that a trial court did not commit plain error by failing to instruct the jury that evidence that the defendant raped and sexually assaulted the victim should not be considered in finding the especially heinous, atrocious, or cruel circumstance. *State v. Moseley*, 338 N.C. 1, 56, 449 S.E.2d 412, 445 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 738 (1995).

The evidence at trial established that defendant raped the seven-year-old victim while he smothered her with a pillow. The medical examiner testified that it would have taken ten to twenty minutes for the victim to die and that the victim would have been conscious for three to seven minutes during this period. The victim shared a room with her grandmother and her three-year-old brother, and defendant apparently raped and smothered the victim while they were present and while the victim's brother watched. On this record we conclude

that any error in failing to limit the jury's consideration of the evidence did not rise to the level of plain error. *See id.* Accordingly, this assignment of error is overruled.

[21] Defendant next contends that the trial court erred by denying defendant's request to address the jury prior to sentencing. Defendant concedes that we have held that a defendant does not have a constitutional, statutory, or common law right to make unsworn statements of fact to the jury at the conclusion of a capital sentencing proceeding. *Green*, 336 N.C. 142, 443 S.E.2d 14. We decline to reconsider our prior holding on this issue. This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant brings forth eight additional issues for this Court's review. In his brief defendant candidly concedes that these issues have previously been decided by this Court adversely to his position. Nevertheless, defendant asks us to reevaluate these prior decisions. Having considered defendant's arguments, we are not persuaded to abandon our prior holdings. These assignments of error are overruled.

## PROPORTIONALITY

Having found defendant's trial and capital sentencing proceeding to be free from prejudicial error, we must undertake our statutory duty to determine whether (i) the evidence supports the aggravating circumstances found by the jury; (ii) passion, prejudice, or any other arbitrary factor influenced the imposition of the death sentence; and (iii) the death sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2).

Defendant was convicted of first-degree murder based on both felony murder and premeditation and deliberation. He was also convicted of first-degree rape. The jury found all three of the aggravating circumstances submitted for its consideration: (i) defendant had been previously convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3); (ii) the murder was committed by defendant while defendant was engaged in the commission of or an attempt to commit first-degree rape, N.C.G.S. § 15A-2000(e)(5); and (iii) the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). The jury found the statutory mitigating circumstance that the capacity of defendant to appre-

ciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6), and rejected the circumstance that the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2).

[22] We have reviewed the evidence supporting each of the aggravating circumstances and conclude that the evidence supports each of them. We further conclude from our review of the record that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. We must now determine whether the sentence of death in this case is excessive or disproportionate.

One purpose of proportionality review is "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Another purpose is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). We compare this case to others in the pool, which we defined in *State v. Williams*, 308 N.C. 47, 79-80, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), and *State v. Bacon*, 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1995), that "are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985).

"In our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate." *State v. Burke*, 343 N.C. 129, 162, 469 S.E.2d 901, 918, *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 409 (1996). This Court has determined that the sentence of death was disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We find the instant case distinguishable from each of these seven cases.

"None of the cases found disproportionate by this Court involved the murder of a child." *State v. Elliott*, 344 N.C. 242, 288, 475 S.E.2d 202, 224 (1996), *cert. denied,*—— U.S. ——, —— L. Ed. 2d ——, 65 U.S.L.W. 3598 (1997); *see State v. Kandies*, 342 N.C. 419, 455, 467 S.E.2d 67, 87, *cert. denied,* —— U.S. ——, 136 L. Ed. 2d 167 (1996); *State v. Walls*, 342 N.C. 1, 71, 463 S.E.2d 738, 776-77 (1995), *cert. denied,* —— U.S. ——, 134 L. Ed. 2d 794 (1996). "Further, we have never found a death sentence disproportionate in a case involving a victim of first-degree murder who also was sexually assaulted." *Kandies*, 342 N.C. at 455, 467 S.E.2d at 87; *see State v. Payne*, 337 N.C. 505, 537, 448 S.E.2d 93, 112 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 292 (1995).

We conclude that this case is most analogous to cases in which this Court has held the death penalty not to be disproportionate. In *Kandies* the defendant was found guilty of murdering the four-year-old daughter of his fiancée. In upholding the death penalty, we emphasized that the defendant was found guilty on the bases of both the felony murder rule and premeditation and deliberation; that the jury found the murder to be especially heinous, atrocious, or cruel; that the victim knew and trusted the defendant; that the murder occurred during the commission of a sexual assault; and that the victim suffered great physical pain in that she was brutally beaten, strangled, and raped. *Kandies*, 342 N.C. at 454, 467 S.E.2d at 87. In *Elliott* we upheld the death penalty where the defendant had assumed a parental role in caring for the young victim; the defendant had brutally beaten the victim; the defendant was convicted of first-degree murder on the basis of premeditation and deliberation; and the jury found the sole aggravating circumstance that the murder was especially heinous, atrocious, or cruel. 344 N.C. at 289-90, 475 S.E.2d at 225; *see also State v. Burr*, 341 N.C. 263, 461 S.E.2d 602 (1995), *cert. denied,* —— U.S. ——, 134 L. Ed. 2d 526 (1996).

In the present case defendant was found guilty on the bases of both the felony murder rule and premeditation and deliberation; defendant had been dating the victim's grandmother for two months at the time of the killing; the seven-year-old victim and her little brother lived with their grandmother, slept in their grandmother's bedroom, and knew defendant; the murder occurred during the commission of a rape; and the jury found the especially heinous, atrocious, or cruel aggravating circumstance. After comparing this case to similar cases in the pool used for proportionality review, we conclude that defendant's death sentence is not excessive or disproportionate.

**STATE v. PERKINS**

[345 N.C. 254 (1997)]

We hold that defendant received a fair trial and capital sentencing hearing free from prejudicial error. Comparing defendant's case to similar cases in which the death penalty was imposed and considering both the crime and defendant, we cannot hold as a matter of law that the death penalty was disproportionate or excessive.

NO ERROR.

Justice WEBB dissenting.

I dissent. I believe it was error to excuse prospective juror William E. Jackson for cause. Mr. Jackson was excused based on the following colloquy:

> THE COURT: Please listen very carefully, Mr. Jackson, to the following questions. Consider your responses carefully before you respond. If you are selected to serve as a juror in this case, can and will you follow the law as it will be explained to you by the Court in deciding whether the defendant is guilty or not guilty of first-degree murder or of any other lesser offense?

> JUROR: Yes, sir.

> THE COURT: If you are satisfied beyond a reasonable doubt of those things necessary to constitute first-degree murder, can and will you vote to return a verdict of guilty of first-degree murder even though you know that death is one of the possible penalties?

> JUROR: Yes, sir.

> THE COURT: Considering your personal beliefs . . . about the death penalty, please state for me whether you would be able or unable to vote for a recommendation of the death penalty even though you are satisfied beyond a reasonable doubt of the three things required by law concerning the aggravating and mitigating circumstances previously mentioned.

> JUROR: I don't know whether I could vote on the death penalty.

> THE COURT: Is that response an able or unable response, sir?

> JUROR: Unable to respond to that.

THE COURT: Unable. Thank you.

Mr. Staten—Jackson, excuse me. If the defendant is convicted of first-degree murder, can and will you follow the law of North Carolina as to the sentence recommendation to be made by the jury as the Court will explain it?

JUROR: Yes, sir.

The majority, relying on *Morgan v. Illinois*, 504 U.S. 719, 734-35, 119 L. Ed. 2d 492, 506 (1992), says "general 'follow the law' questions are not sufficient to 'detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath.' " I submit that in the context of the colloquy in this case, the questions to Mr. Jackson were far more than general follow the law questions.

Mr. Jackson was asked questions concerning the death penalty. He said that he would return a verdict of guilty of first-degree murder if he was satisfied beyond a reasonable doubt of those things necessary to constitute first-degree murder although he knew death would be a possible penalty. He then said he was unable to respond to a question as to his ability to vote for the death penalty if he was satisfied beyond a reasonable doubt of those things which require the death penalty. The court then asked Mr. Jackson whether he could follow the law as to the sentence recommendation if the defendant were found guilty of first-degree murder. Mr. Jackson said, "Yes, sir."

The last question asked Mr. Jackson was not a general "follow the law" question. It was a specific "follow the law" question directed at his ability to vote for the death penalty. Mr. Jackson had been told that there would be a trial to determine guilt and then a proceeding to determine whether the penalty would be death. He had to know when questioned about the sentencing proceeding that he was being asked whether he could vote for the death penalty, and he said that he could do so.

It appears to me that Mr. Jackson gave an ambiguous answer when he said he was unable to respond to the question about his ability to impose the death penalty. He then answered "Yes" with no ambiguity when he was asked a question which could only be interpreted as asking him whether he would vote for the death penalty if it was required by law. I believe it was error to excuse Mr. Jackson on this showing.

I vote for a new sentencing proceeding. *State v. Rannels,* 333 N.C. 644, 655, 430 S.E.2d 254, 260 (1993).

Justice FRYE joins in this dissenting opinion.